OPINION
BAKER, Judge
Appellants-plaintiffs Roberta King and Michael King (collectively the Kings) appeal the trial court’s denial of their motion for judgment on the evidence as the result of a jury’s verdict entered in favor of the appellee-de-fendant Dr. Jack P. Clark upon their complaint for medical malpractice. The Kings also claim that the trial court erroneously instructed the jury with respect to Dr. Clark’s affirmative defenses of contributory negligence and incurred risk. Furthermore, Dr. Clark cross-appeals the trial court’s failure to instruct the jury on the loss of chance doctrine and asserts that the trial court erred in failing to provide the jury with verdict forms authorizing them to reduce the Kings’ damages in light of Roberta’s own negligence.
FACTS[1]
On October 15, 1988, Roberta consulted Dr. Clark, her family physician, regarding a lump in her right breast. Roberta first noticed the lump approximately two weeks pri- or to the October appointment. After performing a physical examination, Dr. Clark noted a one-inch, smooth movable lump on the breast. Dr. Clark made a diagnosis of fibrocystic disease and requested that Roberta undergo a mammogram. Dr. Clark then instructed Roberta to return to his office after completing that test to discuss the results. Dr. Clark also desired to reevaluate the breast lump, and to perform a possible aspiration of the lump. However, Roberta failed to keep the follow-up appointment that had been made for her. Instead, Roberta telephoned Dr. Clark’s office to obtain the results of the mammogram and informed his staff that she wished to cancel the appointment.
Roberta eventually returned to Dr. Clark’s office on October 20 at a nurse’s urging, to discuss the mammogram results. The report evidenced extensive fibrocystic disease in both breasts. On October 20, Dr. Clark performed a needle aspiration of the lump in Roberta’s right breast, which revealed no malignancy.
Thereafter, on November 20, 1992, Roberta again made an appointment with Dr. Clark for an examination of a lump that had appeared under her left breast. While the lump had been present for several months, Roberta did not complain of any soreness. During an examination, Dr. Clark determined that the lump was located in Roberta’s ribcage area. Furthermore, the lump was swollen and measured approximately one inch by two inches. As a result, Dr. Clark ordered a mammogram to evaluate the fibro-cystic changes that may have occurred, and advised Roberta to return to his office in one week.
Roberta completed the mammogram of both breasts on December 2, 1992 which revealed fibrocystic change but no abnormal growth. The radiologist also reported no significant change when comparing the results with the tests that were performed in 1988. On January 29, ■ 1993, Roberta returned to Dr. Clark’s office for a scheduled two-month check-up. As Roberta still reported feeling lumps in her breasts, Dr. Clark again performed a breast examination[2] *1145 and instructed her to return for reevaluation in four months.
Roberta eventually returned to Dr. Clark’s office on June 15, 1993, where her blood pressure was evaluated. She voiced no other complaints during that appointment. Pursuant to Roberta’s request, Dr. Clark performed another breast examination, where he determined that both remained fibrocystic. Roberta consulted with Dr. Clark again on October 23, 1993, complaining that her left breast had been swollen, sore and red, for approximately three to four weeks. R. at 234. During that appointment, Dr. Clark discovered a firm mass in the left breast during the examination. The area was tender and pink. Based upon Roberta’s reported history, Dr. Clark made a working diagnosis of mastitis of the left breast. As a result, Dr. Clark prescribed an antibiotic for the mastitis, ordered an ultrasound and mammogram and advised Roberta that he wanted to examine her again in three days to rale out inflammatory breast cancer. While Roberta returned to Dr. Clark’s office on November 13, 1993, she did not undergo the tests that Dr. Clark had ordered due to tenderness in her breast. During the November 13 office visit, Dr. Clark re-ordered the ultrasound and mammogram and made an appointment for the testing. Although Dr. Clark advised Roberta to return to his office in two weeks, she failed to contact his office. Moreover, she did not have the ultrasound and mammogram testing. Instead, Roberta sought treatment from Dr. Richard Cross on November 29, 1993. At that time, Dr. Cross performed the mammogram that Dr. Clark had ordered five weeks earlier. The results suggested inflammatory breast cancer. Dr. Cross then performed a biopsy which confirmed that suspicion. Sometime in December of 1993, at Dr. Cross’ suggestion, Roberta consulted with Dr. George Sledge, an oncologist, for further treatment. Dr. Sledge recommended treatment commencing in two weeks involving a massive six-month chemotherapy program, followed by a mastectomy, radiation therapy, a bone marrow transplant and additional chemotherapy. Notwithstanding Dr. Sledge’s recommendation, Roberta sought yet another referral from Dr. Cross.
On December 26, 1993, Roberta consulted Dr. Jorge Frank at the Cancer Treatment Centers of America Hospital in Zion, Illinois. Dr. Frank recommended that Roberta undergo a program of chemotherapy treatment. Following his suggestion, Roberta completed the first cycle of chemotherapy between December 28, 1993 and January 2, 1994. Roberta did not return to see Dr. Frank for subsequent treatments. Rather, on January 13,1994, Roberta sought a third opinion from Dr. Cal Streeter. He recommended an alternative course of chemotherapy which included a vitamin supplement. Roberta elected to complete only four of six chemotherapy courses that Dr. Streeter had recommended. Dr. Cross agreed that completing only four of six courses of recommended chemotherapy would diminish the chances of the patient’s survival.
Thereafter, on June 6, 1994, Roberta consulted Dr. James Hollinger, a general surgeon, for an additional opinion concerning the mastectomy that she had been advised to undergo. He, along with the other three physicians who had examined Roberta, advised her that she should undergo the procedure. Roberta refused, but ultimately underwent a lumpectomy in June, 1994. Following the surgery, -an examination of the breast tissue that was removed revealed the presence of cancer cells.
Pursuant to Indiana’s Medical Malpractice Act, the Kings filed a proposed complaint for damages with the Indiana Department of Insurance. A medical review panel rendered its opinion on August 25, 1995, concluding that Dr. Clark failed to comply with the appropriate standard of care with respect to Roberta’s January 29, 1993 office appointment. Thereafter, on October 2, 1995, the Kings filed a complaint for damages in the trial court, asserting that Dr. Clark failed to timely diagnose and treat Roberta’s breast cancer. Moreover, Roberta asserted that Dr. Clark’s negligence reduced her opportunity for survival which caused her pain and suffering, mental anguish and resultant medical expenses. The King’s alleged that Dr. Clark’s malpractice occurred between November, 1992 through November, 1993. Michael also asserted a claim against Dr. Clark *1146 seeking damages for loss of consortium. During a jury trial which commenced on October 20, 1997, the Kings moved for judgment on the evidence with respect to the issues of contributory negligence and incurred risk at the close of Dr. Clark’s case. The trial court denied the motion. Over the Kings’ objections, the trial court gave Dr. Clark’s tendered instructions with regal’d to contributory negligence and incurred risk. Thereafter, on October 23, 1997, the trial court entered judgment upon the jury’s verdict in favor of Dr. Clark.
The Kings now appeal.

DISCUSSION AND DECISION

The Kings contend that the trial court erroneously instructed the jury with respect to the defenses of contributory negligence and incurred risk. Specifically, they assert that it was error to instruct the jury as to those defenses because no evidence was presented at trial establishing the existence of contributory negligence or incurred risk.
To resolve this issue, we initially note our standard of review. When determining whether error resulted from the giving of an instruction, we apply the following three prong test: 1) whether the tendered instruction correctly states the law, 2) whether there is evidence in the record to support giving the instruction, and 3) whether the substance of the instruction is covered by other instructions which are given. Smith v. Hull, 659 N.E.2d 185, 191 (Ind.Ct.App.1995), trams, denied. Moreover, the decision to give a particular instruction rests with the trial court’s sound discretion, and will be reviewed only for an abuse of that discretion. Kelley v. Watson 677 N.E.2d 1053, 1056 (Ind.Ct.App.1997). Specifically, the giving of instructions will be reversed only if the instructions given, as a whole, failed to advise the jury of the applicable law or misled the jury. Id. We note that a trial court may be justified in giving an instruction if there is any evidence to support the instruction. Underly v. Advance Machine Co., 605 N.E.2d 1186, 1191 (Ind.Ct.App.1993), trans. denied. If there exists any facts or circumstances in the case although quite meager, to which the instructions might, upon any view, be pertinent, ... it would not be error to give them, although they were so given to the jury over the objection of the complaining party. Pardue v. Seven-Up Bottling Co. of Indiana, 407 N.E.2d 1154, 1156 (Ind.Ct.App.1980).
In the instant case, the trial court instructed the jury as follows with respect to contributory negligence:
It is the duty of the patient to use such care as a person of ordinary prudence would ordinarily use in circumstances like her own, and if the patient fails to do this, and the failure is a proximate cause of the injuries for which she seeks to recover, she cannot hold the physician answerable for the consequences of her own lack of ordinary care.
If you find that Roberta King failed to exercise reasonable care, which failure proximately contributed to the injuries for which she seeks damages, your verdict should be for Dr. Clark.
R. at 63.
Additionally, the trial court gave the following instruction on incurred risk:
The question of whether or not Roberta King voluntarily incurred the risk of injury is an issue in this case. When a person knows of a danger, understands the risk involved and voluntarily exposes herself to such danger, that person is said to have incurred the risk of injury.
The doctrine of incurred risk is based on the proposition that one incurs all the ordinary and usual risks of an act upon which she voluntarily enters, so long as those risks are known and understood by her. The doctrine is applicable when two elements are present. First, the plaintiff must act voluntarily. Second, she must know and understand the risk to which she voluntarily exposes herself.
If Roberta King voluntarily incurred an increased risk in her cancer recurring, your verdict should be for Dr. Clark.
R. at 64.
This court has determined that a patient’s contributory negligence or incurred risk operates as a complete defense to medical negligence. Smith, 659 N.E.2d at 191. Moreover, in Memorial Hosp. of South Bend, Inc. v. Scott, 261 Ind. 27, 36, 300 N.E.2d 50, 56 (1973), our supreme court established the *1147 rule of contributory negligence in medical malpractice actions as follows:
The general rule on the issue of the plaintiffs contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection.
(Emphasis in original); see also Smith, 659 N.E.2d at 191.
While the Kings urge that the evidence failed to establish that Roberta had incurred the risk or was contributorily negligent, the evidence most favorable to the verdict demonstrates that Roberta waited three to four weeks before seeking a medical evaluation of the symptomatic left breast in October of 1993. Moreover, she did not report her symptoms when she contacted Dr. Clark’s office on October 16, 1993. Roberta also delayed an additional five weeks before obtaining the diagnostic testing that Dr. Clark had ordered.
At trial, Dr. Susan Lottich, an expert witness that the Kings had retained, testified that Roberta had an extremely aggressive-looking cancer that grows so rapidly that the cells could double in number within eight or nine days. R. at 325, 346-47. Dr. Lottich also emphasized that it is critical to treat a cancer as early as possible because any delay allows the cells to become more aggressive and resistant to treatment. R. at 315-17. Dr. Lottich then acknowledged the possibility that cancer cells will spread to other areas of the body increases as the number of cancer cells increases.
We also note that after Dr. Cross had diagnosed Roberta’s cancer, he referred her to Dr. Sledge, the oncologist. Dr. Cross testified that Roberta had an aggressive cancer requiring immediate treatment, and that he had communicated his opinion to Roberta. During an appointment, Dr. Sledge recommended to Roberta that she immediately begin six courses of chemotherapy, followed by a mastectomy, radiation therapy, and more chemotherapy. However, Roberta elected to disregard Dr. Sledge’s recommendations and instead sought consultations from other physicians. When Roberta counseled with Dr. Frank one month later at the Cancer Treatment Center, he also recommended that Roberta immediately begin a six-course chemotherapy treatment. Roberta ignored this recommendation and instead sought a third opinion from Dr. Streeter. He recommended a slightly different regimen of chemotherapy consisting of six courses. The first one was administered on January 31, 1994, two months after Dr. Frank recommended that she immediately begin chemotherapy. Roberta then ceased those treatments after completing only four of the six chemotherapy sessions with Dr. Streeter. Dr. Cross acknowledged that receiving only two-thirds of the recommended chemotherapy treatments reduced Roberta’s chances of survival. R. at 254. In essence, although four physicians had recommended that Roberta undergo a mastectomy, she instead elected to have a lumpectomy.
Notwithstanding this evidence, the Kings urge this court to accept their contention that Roberta could not have been contribu-torily negligent because any alleged negligent conduct on her part occurred only after Dr. Clark’s failure to diagnose and treat her cancer. In Smith v. Hull, we observed that the evidence established that the patient’s conduct and the doctor’s conduct occurred simultaneously and, therefore, it was proper to instruct the jury with respect to the plaintiff-patient’s contributory negligence. Id. at 192. In that case, the plaintiff suffered from male pattern baldness and initially consulted with Dr. Hull for prosthetic hair treatments in April or May of 1979. Id. at 186. Throughout the course of treatment, Dr. Hull repeatedly warned Smith of the risk of possible complications. Id. at 188-89. However, Smith continued to receive injections and numerous scalp reductions from Dr. Hull throughout a five-year period. Prior to each scalp reduction surgery, Dr. Hull warned Smith of the possible complications including scarring and infection. Id. at 189-90. Smith eventually filed a complaint against Dr. Hull for medical malpractice because of the severe scarring that appeared following the surgeries. The jury returned a verdict for Dr. Hull. On appeal, we determined that the *1148 trial court properly instructed the jury with respect to Smith’s contributory negligence. Specifically, we noted that Smith failed to heed Dr. Hull’s advice regarding the frequency of treatment and the limited number of surgeries that should have been performed. Id. at 192.
As in Smith, the medical evaluations, diagnostic testing and treatment for Roberta’s cancer occurred over a lengthy period of time. Because the injury, the lost opportunity to survive, necessarily occurred over this same lengthy time period, or at least until Roberta placed herself under the care of a different physician, the jury might reasonably infer that Roberta’s actions or inactions occurred simultaneously with any fault on Dr. Clark’s part to reduce her chance of survival. Inasmuch as Roberta’s conduct was seemingly united with the actions of Dr. Clark, the jury could properly conclude that her conduct contributed as a legal cause to the harm that [s]he suffered. See id. at 191.
Finally, we note that Dr. Edward Bran-denberger, a member of the medical review panel who reviewed Roberta’s claim, testified at trial. Dr. Brandenberger remarked that, after reviewing Roberta’s medical records and other relevant documents which were unavailable when the medical review panel convened, it was apparent that Roberta only had fibrocystic changes in her breast in 1992 and in January and June of 1993. R. at 714-16. Moreover, Dr. Brandenberger did not believe Roberta’s indication that she found a lump in the upper quadrant of her breast in November of 1992, and further maintained that the cancer could not have occurred until October of 1993. R. at 717. Thus, Dr. Bran-denberger acknowledged that Dr. Clark was under no obligation to biopsy the cystic lesions and that the breast examination Dr. Clark performed on January 29, 1993, complied with the standard of care.[3] R. at 699-700, 733.

CONCLUSION

In light of our discussion above, the evidence presented at trial supports the reasonable inference that Roberta may have delayed in seeking proper treatment, may have delayed in obtaining the diagnostic testing that Dr. Clark had ordered, and may have failed to follow through with the subsequent recommended treatment. Moreover, the jury could have concluded that Roberta’s conduct may have demonstrated a disregard for the risk, and that she may have voluntarily incurred the risk of disregarding the recommendations of four physicians to undergo a mastectomy and treatment.
Inasmuch as our standard of review prohibits us from reweighing the evidence or judging the credibility of witnesses, we decline Roberta’s invitation to reweigh the evidence in her favor. Thus, we find that the evidence was sufficient to support the trial court’s jury instructions on the issues of contributory negligence and incurred risk. Accordingly, we find no error.[4]
Judgment affirmed.
GARRARD, J., concurs.
ROBB, J., dissents with opinion.

. Oral argument was heard in this cause on January 19, 1999, in Indianapolis.

. While Dr. Clark did not recall whether he performed a breast examination on this date, Roberta testified that such an examination was conducted. R. at 87.

. As can be noted by the reader, the result reached by the dissent hinges primarily upon whether Dr. Clark presented evidence sufficient to demonstrate that Roberta's delay in seeking treatment fell below a standard of reasonableness. However, this court has determined that the issue of contributory negligence is a matter most appropriately left for the jury's determination unless the facts are undisputed and only a single inference can be drawn therefrom. Nesvig v. Town of Porter, 668 N.E.2d 1276, 1281 (Ind.Ct.App.1996). After considering all of the evidence that was presented at trial, we cannot say, as a matter of law, that a reasonable trier of fact would be left to conclude that Roberta’s delay in seeking treatment could not have contributed to the harm she sustained. See Smith, 659 N.E.2d at 191. Rather, the set of facts and circumstances gives rise to a reasonable inference that Roberta failed to exercise the degree of care that an ordinary reasonable person would in like or similar circumstances.

. In light of our disposition of the issues with respect to the final instructions, we deem it unnecessary to address Roberta's claim that the trial court erred in denying her motion for judgment on the evidence. We also need not address the contentions asserted by Dr. Clark in his cross-appeal.