**Tulsi SAWLANI, M.D., Appellant–Defendant,**

v.

**Robin MILLS, Appellee–Plaintiff.**

No. 45A05–0407–CV–388.

Court of Appeals of Indiana.

July 13, 2005.

Louis W. Voelker, Kirk D. Bagrowski, Eichhorn & Eichhorn, Hammond, for Appellant.

John M. Kopack, Merrillville, for Appellee.

Peter H. Pogue, Donald B. Kite, Schultz & Pogue, Carmel, James D. Johnson, Rudolph Fine Porter & Johnson, Evansville, for amicus curiae Defense Trial Counsel of Indiana.

## OPINION

SHARPNACK, Judge.

Tulsi Sawlani, M.D., appeals a judgment in favor of Robin Mills on Mills's complaint. Sawlani raises three issues, which we restate as:

I.  Whether the trial court erred by denying Sawlani's motion for judgment on the evidence regarding proximate cause;

II.  Whether the trial court erred by granting Mills's motion for judgment on the evidence regarding Sawlani's affirmative defense of contributory negligence; and

III.  Whether the trial court erred when it instructed the jury regarding damages for increased risk of harm.

We affirm.

The relevant facts follow. In August 1997, Mills noticed a "thickness" and pain in her left breast. Appellant's Appendix at 62–63. Mills discussed her concerns with her doctor, who ordered various tests, including a mammogram. Mills went to Methodist Hospital in Merrillville, Indiana, for the mammogram on September 5, 1997. Sawlani, a radiologist, interpreted Mills's mammogram. After interpreting the films, Sawlani examined Mills's breast and again reviewed the films. On September 6, 1997, Sawlani prepared an exam report, which indicated "No discrete nodule, microcalcification, skin thickening, or nipple retraction is seen bilaterally" and "no radiographic evidence of malignancy." *Id.* at 196. Sawlani recommended in the report that Mills have a follow-up mammogram in one year. Sawlani also sent Mills a letter, which provided in part:

> The above breast examination did not show any sign of cancer.
>
> Please remember that some cancers (about 10%) cannot be found by mammography, and that early detection requires a combination of monthly breast self-examination, yearly clinical breast examination, and periodic mammography.
>
> Mammography is important to your ongoing health. For all women over the age of 40, the American Cancer Society recommends a mammogram every year. In your case, I recommend that you return for a follow-up mammogram in 1 year.
>
> \* \* \* \* \*

*Id.* at 197. Mills read the first sentence of the letter but did not read the rest of the letter.

On May 11, 1999, twenty months after her September 1997 mammogram, Mills obtained another mammogram. The radiologist, Dr. Richard Lichtenberg, found a "[s]uspicious abnormality" and asked Mills to retrieve the films from her 1997 mammogram. *Id.* at 198. Dr. Lichtenberg

prepared an exam report, which provided, in part: "There is a speculated density in the left upper inner quadrant at approximately 11 o'clock which appears to persist on spot views and appears more prominent as compared with the previous exam." *Id.* Mills was diagnosed with breast cancer, and after consultation with a surgeon, she underwent a lumpectomy, radiation, and chemotherapy.

Mills filed her proposed complaint against Sawlani with the Indiana Department of Insurance and alleged that Sawlani "failed to meet the appropriate standards of care, skill and knowledge of physicians limiting their practice to the specialty of radiology in the diagnosis, treatment and care and reading of the mammogram films of the Plaintiff on or about September 6, 1997." *Id.* at 216. A medical review panel found that "the evidence submitted *regarding [Sawlani]* does support the conclusion that [Sawlani] failed to meet the appropriate standard of care as charged in the Complaint but it is a question of fact as to whether the conduct complained of was a factor of the resultant damages." *Id.* at 234 (emphasis in original). Mills then filed her complaint against Sawlani alleging medical malpractice.

A jury trial was held in March 2004. The parties stipulated to the admission of the medical review panel's report. Additionally, during Mills's case-in-chief, she called Dr. Philip Hoffman, an oncologist, to testify. Dr. Hoffman testified that when Mills had surgery in 1999, she had a tumor that was two centimeters in size and had Stage I cancer. Dr. Hoffman testified that if she had been diagnosed in 1997, Mills would have had a tumor that was approximately one centimeter in size and would have had Stage I cancer. According to Dr. Hoffman, a diagnosis in 1997 would have made "a very small difference in her overall prognosis, I would say maybe a two or three percent overall difference in ten-year survival based upon that difference in size." Transcript at 174.

After Mills presented her case-in-chief, Sawlani moved for judgment on the evidence pursuant to Ind. Trial Rule 50. Sawlani argued, in part, that Mills had failed to present evidence demonstrating that Sawlani's care caused Mills's increased risk of harm, i.e. proximate cause. The trial court denied Sawlani's motion for judgment on the evidence.

At the close of evidence, Sawlani renewed his motion for judgment on the evidence, and the trial court again denied the motion. Mills also requested judgment on the evidence regarding Sawlani's affirmative defense of contributory negligence because of Mills's failure to have another mammogram in September 1998, as directed by Sawlani's letter to her. The trial court found that Mills's conduct was "not concurrent with and occurring with [Sawlani's] conduct to produce that initial injury, that is the injury which occurred from the alleged failure to diagnose." Appellant's Appendix at 140. Thus, the trial court granted Mills's motion for judgment on the evidence and stated that it would treat Mills's conduct as a failure to mitigate and would instruct the jury accordingly.

Sawlani tendered a proposed jury instruction regarding damages that provided as follows:

If the plaintiff has proved by a preponderance of the evidence that Dr. Sawlani was negligent, that his negligence was the proximate cause of a delay in the diagnosis of Ms. Mills' cancer, and that the delay in diagnosis substantially increased Ms. Mills' risk of recurrence of cancer, then you must calculate the damages to be awarded. The amount of damages recoverable is equal to the total amount of damages resulting from

Ms. Mills' injury multiplied by the percent by which the risk was increased. *Id.* at 205. Sawlani also tendered a proposed verdict form that provided:

$ _____ (enter total amount of damages from Ms. Mills' injury)
x _____ (percent by which Ms. Mills' risk of harm was increased)
= _____ (damages to be entered in space below)
We therefore award damages to Ms. Mills in the amount of
$ _____.

*Id.* at 206. The trial court refused Sawlani's proposed instruction and verdict form and instructed the jury regarding damages as follows:

If you find from a preponderance of all the evidence that the Defendant is liable to the Plaintiff and that the Plaintiff has suffered damages, you must determine the total amount of money that will fairly compensate Robin Mills after considering the evidence relating to damages. In determining the amount of damages to award Robin Mills, you may consider each of the following elements:

1. The increase in the risk of recurrence from the breast cancer Robin Mills was suffering due to delay in her cancer diagnosis;

2. The physical pain or mental suffering experienced by Robin Mills due to the delay in her diagnosis; and

3. Any lost time from employment suffered by Robin Mills caused by the Defendant's negligence.

Your determination on the damages to award must be based on the evidence relevant to damages presented in this case and not on mere guess or speculation.

*Id.* at 222. This instruction apparently started as Plaintiff's proposed instruction number 7 and was modified by the trial court pursuant to a lengthy discussion between the parties and the trial court. During this discussion, Sawlani objected to the proposed instruction on a variety of specific issues. However, Sawlani never objected to this instruction on the grounds that it did not inform the jury of the proper measure of damages in an increased risk of harm case.

The jury found for Mills and awarded her $250,000 in damages. Sawlani filed a motion to correct error in which he argued that Mills had failed to prove causation and that the damage award was excessive. The trial court denied the motion.

## I.

■■■ The first issue is whether the trial court erred by denying Sawlani's motion for judgment on the evidence regarding proximate cause. The standard of review for a challenge to a ruling on a motion for judgment on the evidence is the same as the standard governing the trial court in making its decision. *Kirchoff v. Selby*, 703 N.E.2d 644, 648 (Ind. 1998). A motion for judgment on the evidence is governed by Ind. Trial Rule 50(A), which provides:

Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

The court looks only to the evidence and the reasonable inferences drawn most fa-

vorable to the nonmoving party, and the motion should be granted only where there is no substantial evidence supporting an essential issue in the case. *Kirchoff,* 703 N.E.2d at 648.

According to Sawlani, the trial court should have granted his motion for judgment on the evidence because Mills failed to prove by expert evidence that Sawlani could and should have diagnosed her cancer in 1997. An analysis of this issue requires us to review the history of increased risk of harm cases:

A. *Mayhue & Restatement (Second) of Torts § 323.*

■ In general, a plaintiff must prove each of the elements of a medical malpractice case, which are that: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; and (3) the breach proximately caused the plaintiff's injuries. *Mayhue v. Sparkman,* 653 N.E.2d 1384, 1386 (Ind.1995). In *Mayhue,* our supreme court considered the situation where a patient is subjected to negligent performance by a physician and dies, but the patient's illness or injury already results in a probability of dying greater than fifty percent.

> No matter how negligent the doctor's performance, it can never be the proximate cause of the patient's death. Since the evidence establishes that it is more likely than not that the medical problem will kill the patient, the disease or injury would always be the cause-in-fact. The plaintiff must ordinarily prove that proper diagnosis and treatment would have prevented the patient's injury or death. In cases such as this one, it appears that a defendant would always be entitled to summary judgment.

*Id.* at 1387. To deal with this situation, our supreme court considered the loss of chance doctrine and the Restatement (Second) of Torts § 323.

The "loss of chance" doctrine is usually traced to *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966), which held:

> When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.

*Id.* (quoting *Hicks,* 368 F.2d at 632). Under the loss of chance doctrine, "[t]he compensable injury is not the result, which is usually death, but the reduction in the probability that the patient would recover or obtain better results if the defendant had not been negligent." *Id.*

As an alternative approach, our supreme court also considered the Restatement (Second) of Torts § 323 (1965), which provides:

> One who undertakes, gratuitously or for consideration, to render services which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm . . . .

*Id.* at 1388. Relying upon *McKellips v. Saint Francis Hosp., Inc.,* 741 P.2d 467 (Okla.1987), the court found that the Restatement (Second) of Torts § 323 was most consistent with Indiana law and adopted the Restatement. *Id.* at 1389. Thus, following *Mayhue,* "once the plaintiff prove[d] negligence and an increase in the risk of harm, the jury [was] permitted to decide whether the medical malpractice

was a substantial factor in causing the harm suffered by the plaintiff." *Id.*

## B. *Scheid & the loss of chance doctrine.*

Next, our supreme court was asked to consider whether a claim for medical malpractice may be asserted where, as in Mills's case, the injury resulting from a physician's negligence has not come to its full potential, and may never do so. *Alexander v. Scheid,* 726 N.E.2d 272, 273 (Ind. 2000). In *Scheid,* the physician failed to follow up on a chest x-ray that revealed a nodule on the patient's lung. *Id.* at 273. Ten months later, the patient was diagnosed with lung cancer. *Id.* at 274. After receiving treatment, the patient went into remission, but her chance of survival was significantly diminished by the delayed diagnosis. *Id.*

The court noted that Section 323 of the Restatement (Second) of Torts, as adopted in *Mayhue,* was inapplicable because Section 323 "presupposes that physical harm has resulted from the negligent care." *Id.* at 278.

*Mayhue* left unresolved the issue presented by the Alexanders' claim. *Mayhue* explicitly pointed out that it dealt with a claim for a patient who had died, allegedly as the result of negligent treatment. Because the patient in *Mayhue* was seriously ill before treatment, the case addressed whether a plaintiff may maintain a cause of action for medical malpractice even though traditional causation standards may not be satisfied.

In contrast, here the issue is whether a reduced chance of survival, which mathematically equates to a decrease in life expectancy, is itself a compensable injury. If it is, a plaintiff may recover for this injury, independently of whether the plaintiff has or has not actually beaten the odds to date.

*Id.* at 279.

For claims such as those presented by the Alexanders, the court adopted the loss of chance doctrine, which is also referred to as "increased risk of harm."[1] *Id.* at 275, 281. The court held that such a patient "may maintain a cause of action in negligence for this increased risk of harm, which may be described as a decreased life expectancy or the diminished probability of long-term survival." *Id.* at 281. The court also clarified that:

Causation and injury are sometimes described together as the collective third element of a medical malpractice claim. *See Mayhue,* 653 N.E.2d at 1386–87 (reciting that, in order to prevail in a medical malpractice cause of action, a plaintiff must establish: (1) the physician owed a duty to the plaintiff; (2) the physician breached that duty; (3) the breach proximately caused the plaintiff's injuries). Causation and injury are distinct, however, and we are confronted with this distinction here.

We think that loss of chance is better understood as a description of the injury than as either a term for a separate

1. The court in *Scheid* noted:

The term "loss of chance" has been applied to a number of related situations. These include: (1) an already ill patient suffers a complete elimination of an insubstantial or substantial probability of recovery from a life-threatening disease or condition; (2) a patient survives, but has suffered a reduced chance for a better result or for complete recovery; and (3) a person incurs an increased risk of future harm, but has no current illness or injury. The first of these was addressed by this Court in *Mayhue.* See 653 N.E.2d at 1384. The Alexanders now present the second, which, like the first, typically arises in the context of a claim of negligent health care. The third commonly arises in connection with claims of exposure to toxic substances, where no adverse results have yet emerged.

*Scheid,* 726 N.E.2d at 276 (footnotes omitted).

cause of action or a surrogate for the causation element of a negligence claim. If a plaintiff seeks recovery specifically for what the plaintiff alleges the doctor to have caused, i.e., a decrease in the patient's probability of recovery, rather than for the ultimate outcome, causation is no longer debatable. Rather, the problem becomes one of identification and valuation or quantification of that injury.

*Id.* at 279. Thus, the court determined that the patient's injury is the loss of chance or increased risk of harm and is distinct from causation. In *Scheid*, the ultimate injury was death, and the increased risk of that result was a decrease in life expectancy. *Id.*

C. *Sawlani's motion for judgment on the evidence.*

Here, Mills claims an increased risk of harm from Sawlani's alleged failure, and, thus, *Scheid* is applicable. Mills presented expert testimony that her increased risk of harm, i.e., her injury, as a result of her delayed diagnosis was "maybe a two or three percent overall difference in ten-year survival." Transcript at 174. Mills was also required to prove that the increased risk of harm was caused by Sawlani's act or omission. Thus, Mills was also required to prove that Sawlani failed to meet the appropriate standard of care by failing to diagnose her cancer in 1997 and that this failure caused the increased risk of harm.

█ Mills's sole evidence in support of Sawlani's failure to meet the appropriate standard of care was the opinion of the medical review panel, which concluded that "the evidence submitted *regarding [Saw-*

*lani* ] **does support** the conclusion that [Sawlani] failed to meet the appropriate standard of care as charged in the Complaint but it is a question of fact as to whether the conduct complained of was a factor of the resultant damages." Appellant's Appendix at 234 (emphasis in original).[2] Our supreme court has held that a medical review panel opinion favorable to the plaintiff on the issue of proximate cause is sufficient to withstand a defendant's motion for judgment on the evidence. *Bonnes v. Feldner,* 642 N.E.2d 217, 221 (Ind.1994). However, Sawlani argues that the medical review panel's opinion does not contain evidence to prove that Sawlani could have diagnosed Mills's cancer in 1997. We disagree.

The medical review panel's opinion states that Sawlani "failed to meet the appropriate standard of care" as charged in the proposed complaint. Appellant's Appendix at 234. The jury was informed that the proposed complaint alleged Sawlani "failed to meet the appropriate standards of care, skill and knowledge of physicians limiting their practice to the specialty of radiology in the diagnosis, treatment and care and reading of the mammogram films of the Plaintiff on or about September 6, 1997." *Id.* at 216. Sawlani argues that this language does not provide evidence that cancer could have been diagnosed at the time of the 1997 mammogram. However, we must construe reasonable inferences from the evidence in a manner most favorable to the nonmoving party, Mills. *Kirchoff,* 703 N.E.2d at 648. While the opinion does not specifically describe how Sawlani failed to meet the appropriate standard of care, the basis for Mills's complaint

**2.** Mills also relies upon the testimony of Dr. Smari Thordarson, a defense expert. However, Dr. Thordarson testified that even in retrospect, knowing that Mills had cancer, he would not have been able to detect an abnor- mality in Mills's left breast in 1997. Dr. Thordarson's testimony did not establish that Sawlani should have diagnosed the cancer in 1997.

against Sawlani was that he should have diagnosed her cancer in 1997. The medical review panel concluded that Sawlani breached the standard of care and, thus, impliedly found that he should have diagnosed the cancer in 1997. Consequently, Mills presented sufficient evidence to withstand Sawlani's motion for judgment on the evidence, and the trial court did not err by denying Sawlani's motion.[3] *See, e.g., Bonnes,* 642 N.E.2d at 220 (holding that the patient presented evidence sufficiently probative of breach of duty to withstand a motion for judgment on the evidence).

## II.

The next issue is whether the trial court erred by granting Mills's motion for judgment on the evidence regarding Sawlani's affirmative defense of contributory negligence. As previously noted, a motion for judgment on the evidence is governed by Ind. Trial Rule 50(A), which provides:

Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter judgment thereon notwithstanding a verdict.

We look only to the evidence and the reasonable inferences drawn most favorable to the nonmoving party, and a motion for judgment on the evidence should be

granted only where there is no substantial evidence supporting an essential issue in the case. *Kirchoff,* 703 N.E.2d at 648.

Mills requested judgment on the evidence regarding Sawlani's affirmative defense of contributory negligence because of Mills's failure to have another mammogram in September 1998, as directed by Sawlani's letter to her. The trial court found that Mills's conduct was "not concurrent with and occurring with [Sawlani's] conduct to produce that initial injury, that is the injury which occurred from the alleged failure to diagnose." Appellant's Appendix at 140. Thus, the trial court granted Mills's motion for judgment on the evidence and stated that it would treat Mills's conduct as a failure to mitigate and would instruct the jury accordingly.

On appeal, Sawlani argues that the trial court erred because Mills's negligence in failing to obtain a mammogram in September 1998 as Sawlani advised "combined with the alleged negligence of Sawlani to cause the claimed injuries." Appellant's Brief at 28. The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable man would exercise in like or similar circumstances. *Memorial Hospital of South Bend, Inc. v. Scott,* 261 Ind. 27, 36, 300 N.E.2d 50, 56 (1973). "Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection." *Id.* A

---

**3.** Sawlani argues that the medical review panel's finding that "it is a question of fact as to whether the conduct complained of was a factor of the resultant damages" conflicts with its finding that Sawlani failed to meet the appropriate standard of care. Appellant's Appendix at 234. We disagree. A reasonable interpretation of the panel's opinion is that the panel concluded Sawlani should have dis-

covered the cancer in 1997, but that it could not determine whether Mills was damaged as a result. Alternatively, the panel may have been considering Mills's failure to obtain a mammogram as directed by Sawlani when it found "a question of fact as to whether the conduct complained of was a factor of the resultant damages." *Id.*

patient may be contributorily negligent by failing to follow a physician's instructions. *Harris v. Cacdac*, 512 N.E.2d 1138, 1139 (Ind.Ct.App.1987), *reh'g denied, trans. denied.* However, in order to constitute a bar to recovery, contributory negligence must be a proximate cause of the injury. *Id.* at 1139–1140. The contributory negligence must unite in producing the injury and, thus, be "simultaneous and co-operating with the fault of the defendant ... (and) enter into the creation of the cause of action." *Id.* at 1140 (quoting 61 AM. JUR. 2D *Physicians and Surgeons* § 302 (1981)).

Negligence on the part of the patient or of those having him in their charge, which occurs wholly subsequently to the physician's malpractice which caused the original injuries sued for, is not a complete defense to any recovery against the physician, but serves to mitigate the damages, preventing recovery to the extent the patient's injury was aggravated or increased by his own negligence, or those having his custody, although he is entitled to recover for the injuries sustained prior to his contributory negligence.

*Id.* (quoting 50 A.L.R.2d 1043, 1055).

In support of his argument that Mills was contributorily negligent, Sawlani relies upon *Fall v. White*, 449 N.E.2d 628 (Ind. Ct.App.1983), and *King v. Clark*, 709 N.E.2d 1043 (Ind.Ct.App.1999), *trans. denied.*[4] In *Fall*, a malpractice action was brought after a patient died of a heart attack. The patient's estate alleged that the physician was negligent by failing to prescribe medication to aid blood circulation, by failing to seek the advice of a heart specialist immediately, by failing to limit the patient's physical activities, and by prescribing Dimetapp Extentab. *Fall*,

449 N.E.2d at 631. The physician alleged that the patient was contributorily negligent by failing to follow the physician's instructions and failing to give the physician complete and accurate information. *Id.* at 632–633. On appeal, the patient argued that the trial court had erred by instructing the jury regarding contributory negligence. *Id.* at 632. Although this court did not engage in a discussion of whether the contributory negligence was simultaneous with the physician's negligence, this court held that the trial court properly instructed the jury regarding contributory negligence. *Id.* at 634.

Similarly, in *King*, a patient brought a medical malpractice action for failure to timely diagnose and treat the patient's breast cancer, and the physician claimed that the patient was contributorily negligent. *King*, 709 N.E.2d at 1045. On appeal, the patient argued that the trial court had erred by instructing the jury regarding contributory negligence. *Id.* at 1046. The evidence revealed, in part, that the patient failed to seek timely medical attention, failed to report her symptoms to the physician, and delayed diagnostic testing that the physician had ordered. *Id.* at 1047. We held:

the medical evaluations, diagnostic testing and treatment for Roberta's cancer occurred over a lengthy period of time. Because the injury, the lost opportunity to survive, necessarily occurred over this same lengthy time period, or at least until Roberta placed herself under the care of a different physician, the jury might reasonably infer that Roberta's actions or inactions occurred simultaneously with any fault on Dr. Clark's part to reduce her chance of survival. Inasmuch as Roberta's conduct was

---

4.  Sawlani also relies upon *Cavens v. Zaberdac*, 820 N.E.2d 1265 (Ind.Ct.App.2005). However, our supreme court granted transfer in *Cavens* on May 20, 2005.

seemingly united with the actions of Dr. Clark, the jury could properly conclude that her conduct contributed as a legal cause to the harm that [s]he suffered. *Id.* at 1048.

We conclude that this case is distinguishable from *Fall* and *King.* In both *Fall* and *King,* the patient's negligence was simultaneous with the physician's alleged negligence. Here, Sawlani's alleged negligence was complete in September 1997. Mills's alleged contributory negligence did not occur until September 1998, when she failed to have another mammogram as directed by Sawlani. Rather, the facts of *Harris,* 512 N.E.2d at 1138, are more similar to this case.. In *Harris,* the physician alleged that the patient was contributorily negligent because she had failed to exercise her neck as directed after surgery. *Harris,* 512 N.E.2d at 1140. We held that the trial court erred by instructing the jury regarding contributory negligence because "[the patient's] alleged negligence in failing to exercise her neck was wholly subsequent to [the physician's] alleged negligence in performing unnecessary surgery." *Id.* Therefore, contributory negligence did not apply to the patient's post-surgery conduct, and the trial court erred by instructing the jury regarding contributory negligence. *Id.* Rather, we concluded that a proper instruction would have been for mitigation of damages. *Id.*

Similarly, here, Mills's alleged negligence was "wholly subsequent" to Sawlani's alleged negligence. *Id.* As the trial court found, contributory negligence principles were inapplicable, but an instruction regarding mitigation of damages was appropriate. There was no substantial evidence supporting Sawlani's affirmative defense of contributory negligence, and,

consequently, the trial court did not err by granting Mills's motion for judgment on the evidence. *See, e.g., id.*

## III.

The final issue is whether the trial court abused its discretion when it instructed the jury regarding damages for increased risk of harm. According to Sawlani and amicus curiae, Defense Trial Counsel of Indiana,[5] the trial court's damages instruction did not adequately inform the jury of the proper measure of damages in an increased risk of harm case, and the trial court abused its discretion by refusing to give Sawlani's tendered damages instruction and verdict form regarding damages.

### A. *Instructions.*

Sawlani's tendered instruction regarding damages provided:

> If the plaintiff has proved by a preponderance of the evidence that Dr. Sawlani was negligent, that his negligence was the proximate cause of a delay in the diagnosis of Ms. Mills' cancer, and that the delay in diagnosis substantially increased Ms. Mills' risk of recurrence of cancer, then you must calculate the damages to be awarded. The amount of damages recoverable is equal to the total amount of damages resulting from Ms. Mills' injury multiplied by the percent by which the risk was increased.

Appellant's Appendix at 205. The trial court refused Sawlani's proposed instruction and instructed the jury regarding damages as follows:

> If you find from a preponderance of all the evidence that the Defendant is liable to the Plaintiff and that the Plaintiff has suffered damages, you must determine

---

**5.** We hereby grant Defense Trial Counsel of Indiana's motion for leave of court to file its amicus curiae brief.

the total amount of money that will fairly compensate Robin Mills after considering the evidence relating to damages. In determining the amount of damages to award Robin Mills, you may consider each of the following elements:

1.  The increase in the risk of recurrence from the breast cancer Robin Mills was suffering due to delay in her cancer diagnosis;

2.  The physical pain or mental suffering experienced by Robin Mills due to the delay in her diagnosis; and

3.  Any lost time from employment suffered by Robin Mills caused by the Defendant's negligence.

Your determination on the damages to award must be based on the evidence relevant to damages presented in this case and not on mere guess or speculation.

*Id.* at 222.

We begin by noting that Sawlani did not object to the trial court's instruction on these grounds. The trial court's damages instruction apparently started as Plaintiff's proposed instruction number 7 and was modified by the trial court pursuant to a lengthy discussion between the parties and the trial court. During this discussion, Sawlani objected to the proposed instruction on a variety of specific issues. However, Sawlani never objected to this instruction on the grounds that it did not inform the jury of the proper measure of damages in an increased risk of harm case. *See, e.g., Estate of Hunt v. Board of Comm'rs of Henry County*, 526 N.E.2d 1230, 1236 n. 5 (Ind.Ct.App.1988) (holding that a party waived an allegation that an instruction was erroneous where the party failed to object at trial to the instruction on those grounds), *reh'g denied, trans. denied; see also* Ind. Trial Rule 51(C) ("No party may claim as error the giving of an instruction unless he objects thereto ...

stating distinctly the matter to which he objects and the grounds of his objection.").

Notwithstanding Sawlani's failure to object to the trial court's instruction on these grounds, we will review whether the trial court erred by refusing to give Sawlani's proposed damages instruction. In reviewing a trial court's decision to give or refuse a tendered instruction, we consider whether the instruction: (1) correctly states the law; (2) is supported by the evidence in the record; and (3) is covered in substance by other instructions. *Wal–Mart Stores, Inc. v. Wright*, 774 N.E.2d 891, 893 (Ind.2002), *reh'g denied.* The trial court has discretion in instructing the jury, and we will reverse on the last two issues only when the instructions amount to an abuse of discretion. *Id.* When the issue is whether the instruction is a correct statement of the law, however, appellate review of the ruling is de novo. *Id.* at 893–894. An analysis of this issue requires us to examine our supreme court's opinions regarding damages for Section 323 of the Restatement (Second) of Torts and the loss of chance doctrine to determine whether Sawlani's proposed instruction was a correct statement of the law, whether the proposed instruction was supported by the evidence, and whether the proposed instruction was covered in substance by other instructions.

1.  *Cahoon, Washington, & Restatement (Second) of Torts § 323 damages.*

In *Cahoon v. Cummings,* 734 N.E.2d 535 (Ind.2000), our supreme court considered a plaintiff's wrongful death action and applied Section 323 of the Restatement (Second) of Torts, as adopted in *Mayhue,* to the wrongful death context where a physician's negligence increased the patient's risk of harm and the increased risk was a substantial factor in the patient's

death. In *Cahoon*, the trial court had instructed the jury that the defendant physicians "would be liable for full wrongful death damages if the jury determined that their actions were a substantial factor in [the patient's] death." *Id.* at 540. The supreme court disagreed with the instruction and concluded:

> Holding the defendant liable for the full value of the wrongful death claim is inconsistent with the statutory requirement that the loss be caused by the defendant who only increased the risk of an already likely result. In effect, it would hold doctors liable not only for their own negligence, but also for their patients' illnesses, which are not the product of the doctors' actions.

*Id.* at 541. Again relying upon *McKellips*, 741 P.2d at 476–477, the court explained that "[i]n order to determine proportional damages, after liability is established, statistical evidence is admissible to determine the 'net reduced figure.'" *Id.* at 540. The "net reduced figure" is "determined by subtracting the decedent's postnegligence chance of survival from the prenegligence chance of survival." *Id.* Then, "[t]he amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action." *Id.* at 540–541.

On the same day that our supreme court issued *Cahoon*, it also decided *Smith v. Washington*, 734 N.E.2d 548 (Ind.2000), *reh'g denied*. There, the patient filed a medical malpractice action for loss of his vision. After a bench trial, the trial court found that the physician was negligent and that the patient's damages were $364,037.84. *Id.* at 550. However, the trial court reduced this figure by fifty percent, which was the probability that the patient would have lost his vision even in the absence of the physician's malpractice.

*Id.* On appeal, our supreme court determined that the trial court properly applied Section 323 of the Restatement (Second) of Torts as adopted in *Mayhue*. *Id.* at 551. Further, the court held that the trial court properly determined the patient's damages by awarding fifty percent of the total damages as the amount traceable to the physician's conduct. *Id.*

### 2. *Scheid, Cahoon, & Loss of Chance Damages.*

In *Scheid*, our supreme court adopted the loss of chance doctrine for cases such as Mills's case, where the injury resulting from a physician's negligence has not come to its full potential and may never do so. *Scheid*, 726 N.E.2d at 273. As previously noted, *see supra* Part I, the court determined that the patient's injury is the loss of chance or increased risk of harm and is distinct from causation. *Id.* at 279. In *Scheid*, the ultimate injury was death, and the increased risk of that result was a decrease in life expectancy. *Id.*

The court acknowledged that "if damages are awardable for the increased risk of an injury that has not yet occurred, the court faces the difficult task of putting a dollar amount on an as yet unknown loss." *Scheid*, 726 N.E.2d at 278. To illustrate the valuation of such an injury, the court gave the following explanation:

> In the Alexanders' case, let us assume the jury concludes from the expert testimony that before the failure to diagnose she had a seventy percent chance of full recovery and a normal life expectancy. As already noted, this is a statistical proposition that seventy of 100 patients with JoAnn's initial condition will have a normal lifetime. To take the simplest example first, assume that there is a 100% chance of successful treatment if there were no negligence. Leaving aside any other individual factors, the patient's life expectancy is the median of

our collective experience as to the age at death of persons of her age and gender. Otherwise stated, a life expectancy is no more than the composite of the remaining lives of a large number of people, some of whom will die the next day and some of whom will become nonagenarians.

Here, at the time of diagnosis, the expert testimony put her chance of survival for five years at approximately twenty percent. To be comparable to her pre-negligence expectancy, it must be converted, which we assume can be done, into a comparable median lifetime or expectancy. A person with a normal life expectancy has only a fifty percent chance of attaining that expectancy. Even if we reduce both the "before" and "after" numbers to comparables, the problem identified earlier remains: expectancy is itself a statistical proposition, and compensating on the basis of expectancy will either overcompensate or undercompensate depending on how long the plaintiff actually lives.

Finally, if we take as our starting point not a normal life expectancy, but the expectancy of someone with an already heightened risk, the analysis is the same, but both the "before" and "after" numbers require a conversion of probability of survival into an expectancy. Presumably we do not have statistics that permit confident evaluation of the anticipated life span of patients with many conditions to the same degree that mortality tables give those values for the general population. Despite these difficulties, and recognizing that it can produce a windfall for some and short-change others, we have compensated for reduced life expectancy in other contexts.

*Id.* at 282.

After giving this explanation of "expectancy," the court held that we must "value the injury at the reduction of the patient's expectancy from her pre-negligence expectancy." *Id.* at 282.

> Ultimately, the jury will have to attach a monetary amount to [the patient's] loss. In so doing, because this is [the patient's] action, the jury will be forced to consider what value to ascribe to the privilege of living. In other contexts, juries are routinely entrusted with the task of awarding damages for injuries not readily calculable. *See Indianapolis Newspapers, Inc. v. Fields*, 254 Ind. 219, 219–20, 259 N.E.2d 651, 656 (1970) (jury awarded $60,000 in libel suit); *Miller v. Ryan*, 706 N.E.2d 244, 247 (Ind.Ct.App. 1999) (jury awarded $325,000 in informed consent claim); *Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 187 (Ind.Ct. App.1998) (jury awarded $250,000 in emotional distress damages to plaintiff who was pricked in the thumb by a hypodermic needle concealed in toilet paper roll). Valuing a determinable number of years of life is no more challenging than these exercises.

*Id.*

Our supreme court next considered damages in a loss of chance action in *Cahoon*. In addition to the wrongful death action, which is discussed above, the plaintiffs in *Cahoon* also brought a survival action. *Id.* at 543–544. The trial court instructed the jury that:

> If you determine that the Defendant's negligence was not a substantial factor in Mr. Cummings' death, but the Defendant's negligence increased the risk of harm to Mr. Cummings by reducing his opportunity for a better result, and that increased risk was a substantial factor in that harm, then you should award such damages as will fairly compensate the Plaintiff for the harm sustained. Harm

may be the loss of opportunity for cure, decreased short-term survival, or unnecessary physical pain and mental suffering. [Joann] Cummings is also entitled to be compensated for her loss of consortium . . . .

*Id.* Although the physician argued that the loss of chance was not compensable, our supreme court determined, based upon *Scheid,* that the patient could recover for the loss of chance or increased risk of harm. *Id.* at 544. The court then held that a "valuation of this injury as outlined" in *Scheid* would be appropriate. *Id.* The court held that, although the instruction above regarding the survival action "did not contain an erroneous statement of law," it was "unclear," and the court encouraged the parties to clarify the instruction on remand. *Id.* However, the court did not specify what was unclear about the instruction.

### 3. *Damages in a loss of chance case.*

In summary, under Section 323 of the Restatement (Second) of Torts, our supreme court held that damages are determined by subtracting the decedent's post-negligence chance of survival from the prenegligence chance of survival and "[t]he amount of damages recoverable is equal to the percent of chance lost multiplied by the total amount of damages which are ordinarily allowed in a wrongful death action."[6] *Cahoon,* 734 N.E.2d at 540–541. On the other hand, in *Scheid,* the court adopted the loss of chance analysis that is applicable here and determined that dam-

ages for such an action should be based upon "the reduction of the patient's expectancy from her pre-negligence expectancy" and the jury must "attach a monetary amount" to the patient's loss of life expectancy.[7] *Scheid,* 726 N.E.2d at 282. Thus, our supreme court has indicated that damages in a loss of chance case are not the same as damages in a Section 323 case.

### 4. *Application to Sawlani's tendered instruction.*

■ Here, Sawlani's proposed instruction provided, in part, that "[t]he amount of damages recoverable is equal to the total amount of damages resulting from Ms. Mills' injury multiplied by the percent by which the risk was increased." Appellant's Appendix at 205. The proposed instruction would have required the jury to calculate Mills's damages pursuant to Section 323 as discussed in *Cahoon* and *Washington* rather than as required in a loss of chance case pursuant to *Scheid.* As Mills had not yet sustained a physical harm from Sawlani's alleged negligence, the loss of chance principles applied, not Section 323. Thus, Sawlani's proposed instruction was not a correct statement of the law, and the trial court did not err by refusing to instruct the jury with Sawlani's proposed instruction. *See, e.g., Kocher v. Getz,* 824 N.E.2d 671, 675 (Ind.2005) (holding that the trial court did not err by refusing the defendant's tendered instructions where the instructions were an incorrect statement of the law).

---

**6.** Mills argues that *Cahoon* is not applicable because it was a wrongful death action, but we find this distinction unpersuasive. While *Cahoon* partially involved a wrongful death action, *Cahoon* also discussed the patient's survival action and specifically discussed *Scheid.*

**7.** Applying the supreme court's explanation of "expectancy" in *Scheid,* Mills should have

presented evidence of her prenegligence expectancy and her postnegligence expectancy. However, Mills only presented evidence of a two-three percent reduction in her ten-year survival. Thus, according to *Scheid,* Mills should have converted this percentage reduction in ten-year survival into a difference in "expectancy."

■ Because the trial court did not err by refusing Sawlani's proposed instruction, the jury was left with the following damages instruction:

In determining the amount of damages to award Robin Mills, you may consider each of the following elements:

1. The increase in the risk of recurrence from the breast cancer Robin Mills was suffering due to delay in her cancer diagnosis;

2. The physical pain or mental suffering experienced by Robin Mills due to the delay in her diagnosis; and

3. Any lost time from employment suffered by Robin Mills caused by the Defendant's negligence.

Your determination on the damages to award must be based on the evidence relevant to damages presented in this case and not on mere guess or speculation.

Appellant's Appendix at 222. Notwithstanding Sawlani's failure to object to this instruction on the grounds that it did not adequately instruct the jury as to damages in a loss of chance case, we note that this instruction is similar to that given in *Cahoon* with respect to the plaintiff's survival action. There, the trial court instructed the jury that:

If you determine that the Defendant's negligence was not a substantial factor in Mr. Cummings' death, but the Defendant's negligence increased the risk of harm to Mr. Cummings by reducing his opportunity for a better result, and that increased risk was a substantial factor in that harm, then you should award such damages as will fairly compensate the Plaintiff for the harm sustained. Harm may be the loss of opportunity for cure, decreased short-term survival, or unnecessary physical pain and mental suffering. [Joann] Cummings is also entitled

to be compensated for her loss of consortium . . . .

*Cahoon*, 734 N.E.2d at 543–544. Our supreme court found that, while the instruction in *Cahoon* was not "an erroneous statement of law," it was "unclear" and directed the parties to clarify the instruction on remand. *Id.* at 544. The court did not specifically identify how the instruction was unclear, but noted that a valuation of the injury as outlined in *Scheid* would be appropriate. As noted above, *Scheid* requires that damages for such an action should be based upon "the reduction of the patient's expectancy from her pre-negligence expectancy." 726 N.E.2d at 282. Thus, the trial court's damages instruction, while not as complete as it should be, was not an erroneous statement of the law. *See, e.g., id.*

B. *Verdict form.*

■ Sawlani also tendered a proposed verdict form that provided:

We the jury find for the plaintiff, Robin Mills, and against the defendant, T.C. Sawlani, M.D., and calculate plaintiff's damages as follows:

$_____ (enter total amount of damages from Ms. Mills' injury)

x_____ (percent by which Ms. Mills' risk of harm was increased)

=_____ (damages to be entered in space below)

We therefore award damages to Ms. Mills in the amount of $_____.

*Id.* at 206. The trial court refused Sawlani's proposed verdict form. Sawlani argues in his summary of the argument that the trial court erred by refusing to give his proposed verdict form. However, Sawlani presents no further argument regarding the verdict form. Consequently, he has waived the issue. *See, e.g., Marsh v. Dix-*

*on,* 707 N.E.2d 998, 999–1000 (Ind.Ct.App. 1999), *trans. denied.*

⬛ Waiver notwithstanding, based upon our analysis above, Sawlani's proposed verdict form was not a correct statement of the law. Moreover, we note that "[s]pecial verdicts and interrogatories to the jury are abolished" in Indiana. Ind. Trial Rule 49. Sawlani's proposed verdict is in the nature of a special verdict or an interrogatory to the jury. While similar verdict forms are utilized in comparative fault actions, our supreme court has noted that such verdict forms are required under the statutory scheme of the Comparative Fault Act. *State Through Highway Dep't v. Snyder,* 594 N.E.2d 783, 786 (Ind.1992). The court viewed "this as an attempt by the legislature to prescribe a procedure by which the jury might be guided through the process of determining fault and assessing damages, and [did] not intend to discourage the use of these forms in assisting the jury to properly determine fault and award damages in controversies tried under the Comparative Fault Act." *Id.; see also Tincher v. Davidson,* 762 N.E.2d 1221, 1224 (Ind.2002). Unlike in comparative fault actions, we do not have statutory authority for such verdict forms here. Consequently, we conclude that the trial court did not err by refusing Sawlani's proposed verdict form.

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

FRIEDLANDER, J. concurs.

BAKER, J. concurs with separate concurring opinion.

BAKER, Judge, concurring.

I agree with the result reached by the majority but write separately to emphasize that our affirmance of the trial court's decision with respect to the jury instruc-tion on loss of chance damages should not be interpreted as a conclusion that the instruction was appropriate. To the contrary, as noted by the majority, our Supreme Court has disapproved of a very similar instruction because it was unclear but has stopped short of finding it to be erroneous. *Cahoon v. Cummings,* 734 N.E.2d 535, 544 (Ind.2000). The *Cahoon* court instructed the parties to clarify the instruction on remand. *Id.* Here, the majority echoes this disapproval by saying that the trial court's jury instruction was "not as complete as it should be," Op. p. 938, but declining to go so far as to find it to be erroneous.

In light of *Cahoon* and this case, I caution parties and trial courts to avoid using this or a similar jury instruction. While we have not yet gone so far as to find it to be erroneous, we have now issued two warnings about its lack of clarity and completeness, and we are fast approaching a time when it will no longer be a sufficient statement of the law.

Accordingly, I suggest that litigants and trial courts hone the jury instruction regarding loss of chance damages. To that end, I suggest that the following would be a clearer and more appropriate statement of the law as it currently stands:

> In determining the amount of damages to award the plaintiff, you must decide whether the defendant's negligence caused a decrease in the plaintiff's life expectancy.

> To make this determination, you should carefully consider the evidence presented as to what plaintiff's normal life expectancy would have been had the alleged negligent acts or omissions not occurred, compared to her life expectancy now as shown by the evidence.

> If you find that the plaintiff has a decreased life expectancy proximately

caused by the defendant's negligence, then you may award such damages as you believe will fairly compensate the plaintiff for this loss. You must value plaintiff's damages based upon the difference between the plaintiff's life expectancy before and after defendant's negligence. In addition to considering the change in plaintiff's overall life expectancy, you may also consider the loss of opportunity for a cure and unnecessary physical pain and mental suffering.

In considering the extent of loss of life expectancy, you may consider the medical and statistical evidence submitted by the parties to guide your determination.

If you decide that the plaintiff has a decreased life expectancy proximately caused by the defendant's negligence, you are not to assess damages that would occur beyond the life expectancy determined by you.

*See Alexander v. Scheid,* 726 N.E.2d 272, 282–83; Burke, Kevin G., *A New Remedy for a Life Cut Short,* 40–MAR Trial 64, 64 n. 1, 66–67 (March 2004) (citing to and quoting from *Townsend v. Little Co. of Mary Hosp. & Health Care, Inc.,* No. 00 L 3555 (Ill., Cook County Cir. Ct. Dec. 3, 2002)).

I believe that the foregoing is a more clear and complete recitation of the law in Indiana regarding loss of chance damages, and I encourage parties and trial courts to consider using this instruction or a version thereof should the issue arise.