# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**DAVID W. STONE, IV**
Stone Law Office & Legal Research
Anderson, Indiana

**JOHN P. NICHOLS**
Anderson & Nichols
Terre Haute, Indiana

ATTORNEYS FOR APPELLEES:

**SHEILA M. SULLIVAN**
**SCOTT P. SULLIVAN**
Flynn & Sullivan, PC
Indianapolis, Indiana



**FILED**
May 30 2012, 9:06 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

JAMES ANDROUSKY, II, Individually and as )
Personal Representative of THE ESTATE OF )
JAMES ANDROUSKY, III, Deceased, )
                                        )
    Appellant, )
                                        )
       vs. )     No. 83A01-1103-CT-137
                                        )
COLE A. WALTER and )
TAMMRA ANDROUSKY, )
                                        )
    Appellees. )

APPEAL FROM THE VERMILLION CIRCUIT COURT
The Honorable Bruce V. Stengel, Judge
Cause No. 83C01-0908-CT-008

**May 30, 2012**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

James Androusky II (Father), individually and as personal representative of the estate of James Androusky III (James), filed a child wrongful death action against Cole Walter following the drowning death of James in Walter's residential swimming pool. Father appeals the jury verdict in favor of Walter, presenting the following restated instructional issues:

1. Did the trial court abuse its discretion by instructing the jury to determine whether James was an invitee or licensee?

2. Did the trial court abuse its discretion by instructing the jury regarding abandonment under the Child Wrongful Death Act?

3. Did the trial court improperly instruct the jury regarding a state administrative pool safety regulation?

4. Did the trial court properly instruct the jury on the effect of a parent's failure to supervise his or her child around a known or obvious condition upon the land?

We affirm.

Father and Tamara Androusky (Mother) married right out of high school in 2004. James was the second child born to their marriage, on February 22, 2006. Although the marriage ended in divorce in July 2006, Mother and Father were together on and off again until October 2008. During this time, they had a third child in December 2007. Father never paid the court-ordered support, but he did provide financial support to some extent when he and Mother were together.

Mother married her long-time friend, Matthew Hollingsworth, in August 2006 so that she would have medical insurance to cover a gall bladder operation. Father apparently lived with Mother and Hollingsworth in South Carolina during at least part of this marriage, which

2

ended in April 2007. Mother moved back to Indiana with Father in July 2007. As set forth above, their unstable relationship ended in October 2008, and Mother eventually moved back to South Carolina with the children.

Following a conviction for theft in February 2009, Father drafted a document pursuant to which he attempted to terminate his parental rights to his three children in exchange for Mother's non-enforcement of any child support obligation. Father filed the notarized document, which was signed by Mother and Father, with the Parke Circuit Court on April 23, 2009.

Thereafter, in July 2009, Hollingsworth and Mother planned a trip back to Indiana with the kids. Hollingsworth notified Cole Walter, his former step-father, of the upcoming visit. Walter told Hollingsworth that he would like to see him but that Mother and her children were not welcome. Therefore, Hollingsworth, Mother, and the children initially stayed with Mother's family until they were kicked out due to an argument between Mother and her mother.

Late in the evening on Wednesday, July 22, Hollingsworth arrived at Walter's home with Mother and the children. Walter was already in bed, as he worked very early in the morning. Hollingsworth, Mother, and the three children slept in Hollingsworth's old bedroom. While at work the following day, Walter learned from his live-in girlfriend, Donna Kelly, that Mother and the children had spent the night at his home. He planned to confront Hollingsworth after work, but when he returned home, they were not there. Once again, they arrived that night after Walter went to bed.

Friday afternoon while Kelly and Walter were away, Hollingsworth and Mother had

others over for a pool party in Walter's backyard.  When Walter arrived home that evening, he was not happy at the scene in his backyard.  He immediately confronted Hollingsworth and told him that they had to leave.  Hollingsworth agreed to leave but then asked if they could stay just one more night, as he and Mother had nowhere else to go.  Walter reluctantly agreed that they could stay until morning, at which time they would "get up, have breakfast, [and] leave".  *Transcript* at 304.

The next morning, Walter once again left early in the morning for work.  The boys awakened Hollingsworth around 8:00, and he got them dressed and took them downstairs for breakfast while Mother continued to sleep.  Around 10:30, Mother was still in bed, Hollingsworth was on his laptop, and children were watching cartoons.  At some point three-year-old James and his four-year-old brother asked to play outside.  Hollingsworth let them out to the backyard through the kitchen door[1] and periodically checked on them as they played at the bottom of the steps.  Shortly thereafter, Mother came downstairs and stepped outside with the boys.  Mother came back inside and left the boys unattended in the fenced-in backyard that contained an open, in-ground pool.  When Mother eventually returned outside, she did not see James.  She yelled for Hollingsworth and then ran around the side of the house and to the front porch.  Both she and Hollingsworth then looked in the house for him until it finally occurred to Hollingsworth that he might be in the pool.  Hollingsworth

---

[1]  We note this was the only door to the backyard and, in addition to a lock, it had an alarm that sounded whenever the door was opened.

4

immediately ran to the pool, dove in, and found James at the bottom. James was taken off life support the day after the incident when it was determined that he was brain-dead.

Father filed the instant child wrongful death action against Walter on August 19, 2009.[2] The complaint was based on premises liability and alleged negligence for lack of fencing between the home and the pool, lack of a safety cover over the pool, and lack of supervision around the pool. Following unsuccessful summary judgment motions by both parties, a jury trial commenced on February 22, 2011. The jury returned a verdict in favor of Walter on March 1, 2011. Father now appeals, challenging a number of instructions given by the trial court.

In reviewing a trial court's decision to give or to refuse tendered instructions, we consider: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the giving of the instruction; and (3) whether the substance of the instruction is covered by other instructions which are given. *Franciose v. Jones*, 907 N.E.2d 139 (Ind. Ct. App. 2009), *aff'd on reh'g*, 910 N.E.2d 862, *trans. denied*. The trial court has discretion in instructing the jury and will be reversed on the last two above only when the instruction amounts to an abuse of discretion. *Id.* We, however, review whether an instruction correctly states the law *de novo. Id.* A party seeking a new trial on the basis of instructional error must show a reasonable probability that the complaining party's substantial rights have been adversely affected. *See Dyer v. Doyle*, 870 N.E.2d 573 (Ind. Ct. App. 2007), *trans. denied*.

---

[2] The action also included Mother as a codefendant and Hollingsworth as a non-party.

1.

Father initially claims that the trial court abused its discretion by instructing the jury regarding licensee versus invitee status. He argues that there was no evidence presented at trial that James was a licensee and that the undisputed evidence established he was a social guest/invitee. We cannot agree.

A landowner's liability to persons on the premises generally depends on the person's status as a trespasser, licensee, or invitee. *See Kopczynski v. Barger*, 887 N.E.2d 928 (Ind. 2008). While the determination of the duty owed by a landowner is ordinarily a question of law for the court to decide, "it may turn on factual issues that must be resolved by the trier of fact." *Id*. at 931.

In *Burrell v. Meads*, 569 N.E.2d 637 (Ind. 1991), our Supreme Court adopted the invitation test as the analytical framework for deciding which visitors will be afforded invitee versus licensee status. *Id*. at 642 ("the invitation itself must be the first step of any inquiry into invitee status"). Relevant to our discussion here, the Court held that a social guest is entitled to invitee status. A social guest is one who enters the landowner's property pursuant to an "express or reasonably implied invitation." *Id*. at 643.

On the other hand, licensees are not invited guests and "enter the land of another for their own convenience, curiosity, or entertainment". *Rhoades v. Heritage Investments, LLC*, 839 N.E.2d 788, 791 (Ind. Ct. App. 2005), *trans. denied*. They have a privilege to enter or remain upon the land by virtue of the landowner's "permission or sufferance." *Id*. *See also Christmas v. Kindred Nursing Ctr. Ltd. P'ship*, 952 N.E.2d 872 (Ind. Ct. App. 2011).

Thus, in determining a visitor's status, the distinction between invitation and

6

permission becomes critical. *Rhoades v. Heritage Inv., LLC*, 839 N.E.2d 788. "An invitation differs from mere permission in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter the land; permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so." *Christmas v. Kindred Nursing Ctr. Ltd. P'ship*, 952 N.E.2d at 879 (quoting Restatement (Second) of Torts § 332). "[T]he decisive factor with regard to whether the possessor had extended an 'invitation' or 'permission' is the interpretation that a reasonable man would put upon the possessor's words and actions given all the surrounding circumstances." *Rhoades v. Heritage Inv., LLC*, 839 N.E.2d at 792.

In the instant case, Walter presented evidence indicating that Mother and her children were not expressly or impliedly invited to stay at his home. In fact, Walter made clear that they were not welcome and reluctantly agreed to allow them to stay one night only because Hollingsworth indicated they had nowhere else to go. Under the specific facts of this case, one could reasonably conclude that Mother and her children were not social guests but were rather licensees merely permitted by Walter to stay until the morning.[3] *Cf. Burrell v. Mead*, 569 N.E.2d at 643 ("Burrell and the visitors in the three other cases we decide today were all individuals known to the landowner who came to the premises upon actual invitation or arguably upon standing invitation"); *Dunifon v. Iovino*, 665 N.E.2d 51, 56 (Ind. Ct. App.

---

[3] Moreover, even if they were invitees that night, there was evidence presented indicating that they exceeded the scope of their limited invitation when they did not promptly awake, get ready, and vacate the home on the day of the drowning. *See Rider v. McCamment*, 938 N.E.2d 262, 268 (Ind. Ct. App. 2010) ("when an invitee exceeds the scope of invitation, she loses her status"). Contrary to Father's assertion on appeal, there is no indication in the record that "[t]hey were getting ready to leave when the child drowned." *Appellant's Reply Brief* at 3.

7

1996) ("Meredith engaged in pleasantries with Iovino upon the groups' arrival and generally treated Iovino as a social guest"), *trans. denied*. The trial court did not err by instructing the jury on licensee status.

2.

Father next challenges the trial court's decision to instruct the jury on Walter's abandonment defense. He contends this was an abuse of discretion because there was no evidence in the record to support the giving of such an instruction.

The challenged instruction provides as follows:

> [Walter] also claims that [Father] is not entitled to recover, because he abandoned [James] during his lifetime. To prove this defense, Cole Walter must prove by the greater weight of the evidence that [Father] made only token efforts to support or to communicate with [James] during his lifetime, and by such actions abandoned James, precluding recovery [under] the Child Wrongful Death Act.

*Transcript* at 476.

Under the Child Wrongful Death Act, "a parent who abandoned a deceased child while the child was alive is not entitled to any recovery under [the Act]." Ind. Code Ann. § 34-23-2-1 (i) (West, Westlaw through 2011 1st Regular Sess.). In the instant case, the evidence indicates that Father and Mother's relationship ended for good in October 2008. After that time, there is evidence that Father saw James infrequently and provided little to no financial support. Further, in April 2009, Father drafted, executed, and filed with the court a document purporting to terminate his parental rights to James and his two other sons in exchange for the non-enforcement of his child support obligation.

On appeal, as well as at trial, Father asserts reasons for failing to pay child support and

8

for attempting to sign away his parental rights several months prior to the drowning. We agree with Walter that the essence of Father's argument focuses on the weight or credibility of the evidence of abandonment, not the lack thereof. Though conflicting, there was evidence in the record to support giving the abandonment instruction. Therefore, the trial court did not abuse its discretion in so instructing the jury.

3.

Father next challenges the trial court's instruction regarding an administrative pool safety regulation. 675 Ind. Admin. Code 20-4-27, the regulation in effect at the time of James's death,[4] provided in relevant part as follows:

> (c) Access to residential pools shall be restricted by one (1) of the following means:
>> (1) Walls or fencing not less than five (5) feet high and completely surrounding the pool and deck area with the exception of self-closing and latching gates and doors, both capable of being locked.
>> (2) Other means not less than (5) feet high and deemed impenetrable by the enforcing authority at the time of construction and completely surrounding the pool and deck area when the pool is not in use.
>> (3) A combination of subdivisions (1) and (2) that completely surrounds the pool and deck with the exception of self-closing and latching gates and doors which are capable of being locked….
>> (4) A power safety pool cover….

Father claims that the trial court improperly interpreted the regulation by instructing the jury that the regulation "does not require there to be a fence between the house and the pool, and

---

[4] This regulation was repealed in 2011 and filed, with changes, at 675 Ind. Admin. Code 14-4.3-296.

the walls of the house and garage can be part of the enclosing walls and fences." *Transcript* at 479.

Father's argument is based upon his assertion that "[f]encing *immediately* surrounding the pool and deck area is far more effective as a safety measure that [sic] simply fencing a yard*." Appellant's Reply Brief* at 8 (emphasis supplied). We have no doubt this is true, but our interpretation of the regulation is not controlled by the fact that four-sided isolation pool fencing is safer than traditional three-sided property-line fencing.[5] A plain reading of the regulation simply does not support the interpretation advanced by Father. Rather, property-line fencing, with the home acting as one of the walls surrounding the pool area, is clearly adequate under 675 I.A.C. 20-4-27 (c).[6] The trial court properly instructed the jury in this regard.

With respect to the instruction regarding this regulation, Father also contends that the trial court improperly instructed the jury that a violation of the regulation could be considered as "mere evidence of negligence" or "evidence tending to show a lack of reasonable care". *Transcript* at 479. He argues that the trial court should have instructed that violation of the

---

[5] The Centers for Disease Control and Prevention reports "an 83% reduction in the risk of childhood drowning with a four-sided isolation pool fence, compared to three-sided property-line fencing." CDC.gov, Unintentional Drowning: Fact Sheet, http://www.cdc.gov/homeandrecreationalsafety/water-safety/waterinjuries-factsheet.html (last visited April 20, 2012).

[6] We observe that other states have adopted statutes expressly requiring isolation fencing if other safety measures (such as a safety pool cover) are not present. *See, e.g*., Ariz. Rev. Stat. Ann. § 36-1681(C) (providing that if a residence constitutes part of the enclosure for the pool, there shall be between the pool and residence a minimum four foot wall, fence or barrier); Cal. Health & Safety Code § 115921 (c) (defining enclosure as "a fence, wall, or other barrier that isolates a swimming pool from access to the home") and § 115922 (1) ("pool shall be isolated from access to a home by an enclosure"); Fla. Stat. Ann. § 515.29 (1)(c) ("barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool") and (5) ("[a] wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool").

10

regulation is negligence per se. Such an instruction, however, would have been error because the violation of an administrative regulation is "only some evidence of negligence for the jury to consider." *Zimmerman v. Moore*, 441 N.E.2d 690, 696 (Ind. Ct. App. 1982). *See also Town of Kirklin v. Everman*, 29 N.E.2d 206 (Ind. 1940) (opinion on rehearing); *Lachenman v. Stice*, 838 N.E.2d 451 (Ind. Ct. App. 2005), *trans. denied*. Further, even if the instruction was erroneous, which it was not, any error would be harmless. Father, by counsel, essentially acknowledged in closing that there was no violation of the regulation and asked the jury to focus instead on common-law negligence. *See Transcript* at 467 (counsel urged the jury to "just forget about the regulation").

4.

Finally, Father challenges the following instruction given by the trial court over his objection:

> Absent exigent circumstances, Indiana law dictates that the duty to provide for a child's safety will always rest with the child's parent. In addition, persons entrusted with children have a duty to supervise their charges and exercise ordinary care on behalf of the child in their custody…. If a parent or person charged with the care of a child has been warned of a condition, or if a condition is or should be obvious to the parent, the homeowner does not owe a duty of care to the parent's child, and the parent's failure to supervise the child properly is the proximate cause of the injury or death….. Unless you find that exigent circumstances existed that would have alleved [sic] [Mother] and Matthew Hollingsworth of the duty to supervise James Androusky III, you must find in favor of Cole Walter and no further deliberation is needed with regard to allegations against this Defendant.

*Id*. at 477.

Father's complaint with respect to this instruction turns primarily on the perceived unfairness in depriving him of recovery for the death of his son due to the negligence of his

11

ex-wife and her boyfriend. Father's argument in this regard is misguided in that it is focused entirely on his right to recover damages and ignores the fact that Walter's negligence must first be established. Before damages are recoverable, Father must first establish that Walter owed a duty to James, he breached that duty, and James's death was proximately caused by that breach. *See Harradon v. Schlamadinger*, 913 N.E.2d 297 (Ind. Ct. App. 2009), *trans. denied*.

In the case of *Harradon*, upon which the challenged instruction was premised, an infant suffocated while sleeping on a sofa with her mother during a visit at the defendants' home. In affirming summary judgment in favor of the homeowners, we observed that the parents were the exclusive caregivers to the infant while on the premises and that they were "very aware of the dangers of sleeping on the sofa with the baby", yet chose to do so anyway. *Id*. at 302. We analogized the situation to an attractive nuisance case in which a child was injured while sledding with his father on the landowner's property and the attractive nuisance doctrine was found to be inapplicable. *See Kelly v. Ladywood Apartments*, 622 N.E.2d 1044 (Ind. Ct. App. 1993), *trans. denied*.[7] With *Kelly* in mind, we stated that "absent exigent circumstances…, public policy and common sense dictate that the duty to provide for a child's safety will usually rest with the child's parents while the child is in the parents'

---

[7]   We explained the inapplicability of the attractive nuisance doctrine in *Kelly* as follows:

> The immediate presence of Kelly's father negates all of the policy reasons for shifting the duty to care for this child from his father to Ladywood. Kelly was brought to the hill by his father and supervised by his father. Under the attractive nuisance doctrine, the trespassing child must have failed, because of his youth, to discover the condition or realize the danger involved in going on to the defendant's property. 62 Am.Jur.2d *Premises Liability* § 326 (1990). As an adult, Kelly's father, not Ladywood, is charged with the care of his son and with understanding and appreciating the possible danger that snow may cover objects which would obstruct a sled's path.

12

presence." *Harradon v. Schlamadinger*, 913 N.E.2d at 302. In light of the parents' knowledge and assumption of the risks involved to the infant under their exclusive care, we concluded as a matter of law that the homeowners "did not breach the duty of reasonable care they owed to the Parents' baby." *Id*. at 303.

To the extent that *Harradon* may imply that a landowner's duty is eliminated by the presence of a child's parent when the parent is fully aware of a danger on the land, we disagree. The landowner, of course, continues to owe a duty to the child. The ultimate question, as decided in *Harradon* as a matter of law, is whether the landowner breached the duty. Though not one of the arguments raised by Father on appeal, we observe that the instruction improperly indicated that under certain circumstances Walter would owe no duty of care to James. This error, however, is inconsequential here.

It is undisputed that Walter was not home at or near the time of James's death and that Mother and Hollingsworth were the adults exclusively caring for three-year-old James and his siblings. Further, Mother and Hollingsworth were completely aware of the open swimming pool in Walter's fenced-in backyard. Despite knowledge of this dangerous condition, Mother allowed her three- and four-year-old sons to play in the backyard unattended and within close proximity to the pool.

Assuming Mother and her children were invitees, Walter was subject to liability for physical harm caused by a condition upon his land if, but only if, he:

(a)    knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

*Id*. at 1049.

13

(b)      should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c)      fails to exercise reasonable care to protect them against danger.

*Harradon v. Schlamadinger*, 913 N.E.2d at 301 (citing Restatement (Second) of Torts § 343). When the injured invitee is a child, we apply this standard by also considering the child's abilities, age, experience, and maturity.[8] *Id. Harradon*, however, counsels that we should not in every instance look blindly to the child's ability to discover the danger. Rather, when a parent is present and fully aware of the danger but consciously (and, as in the instant case, recklessly) disregards the risks while caring for the child, the landowner should not generally be found to have breached the duty owed to the child. *See id*.

In sum, although the instruction based upon *Harradon* was not an entirely correct statement of the law, the instruction did not adversely affect Father's substantial rights. Under the specific circumstances of this case as set out above,[9] we hold as a matter of law that Walter did not breach any duty owed to James and the sole proximate cause of James's death was Mother's lack of supervision.[10]

Judgment affirmed.

MAY, J., and BARNES, J., concur.

---

[8] Similarly, our courts have extended greater protection to child licensees than adult licensees, requiring the landowner to consider the child's youth and lack of experience in assessing the ability of a child to perceive and avoid danger. *See Johnson v. Pettigrew*, 595 N.E.2d 747, 750 (Ind. Ct. App. 1992) ("if a landowner can anticipate that a child will not perceive a danger obvious to adults…he may be required to take additional precautions to protect his child licensees"), *trans. denied*.

[9] We emphasize that this is not a case in which a child unknowingly wandered out of the house and fell into the swimming pool. On the contrary, the adults caring for James consciously and recklessly allowed him to play outside near an open swimming pool without supervision.

[10] Walter raises two issues in his cross appeal, which are moot given our determination of the issues raised by Father. Therefore, we do not address the cross-appeal issues.