# FOR PUBLICATION



FILED

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**EDWARD L. MURPHY, JR.**
**WILLIAM A. RAMSEY**
Murphy Ice & Koeneman LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**MARY A. FINDLING**
Findling Park & Associates, P.C.
Indianapolis, Indiana

**MICHAEL J. WOODY**
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

_____

| | | |
|---|---|---|
| ROGER JAY PIATEK, M.D., and | ) | |
| THE PIATEK INSTITUTE, | ) | |
| | ) | |
| Appellants-Defendants, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1209-CT-463 |
| | ) | |
| SHAIRON BEALE, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David A. Shaheed, Judge
Cause No. 49D01-0711-CT-51055

**May 20, 2013**

**OPINION - FOR PUBLICATION**

**MAY, Judge**

Roger Jay Piatek, M.D., and the Piatek Institute (collectively "Piatek") appeal a jury verdict in favor of Shairon Beale ("Beale"). They raise three issues, which we consolidate and restate as:[1]

1.    Whether the trial court should have granted Piatek's motion for a mistrial; and

2.    Whether the trial court should have instructed the jury on contributory negligence and incurred risk.

We affirm.

### FACTS AND PROCEDURAL HISTORY

In 2003, Beale attended a seminar at the Piatek Institute. During that seminar, Dr.

---

[1] Piatek complains of several violations of motions *in limine*, but we are unable to address those allegations of error. There is no reference to these alleged violations in Piatek's Statement of Issues. We remind counsel that Appellate Rule 46(A)(4) requires a statement of the issues that "concisely and particularly describe[s] each issue presented for review."

Piatek first asserts Beale's counsel made certain improper statements and he directs us to page 23 of the transcript. We note initially that some of the pages of the transcript, including page 23, are out of sequential order. That is a violation of App. R. 28, which requires "[t]he pages of the Transcript shall be numbered consecutively." We were able to find page 23, and while it reflected the allegedly improper statements were made in Beale's opening argument, it also reflects Piatek's counsel did not object to those statements. We decline to address them now. *See Stamper v. Hyundai Motor Co*., 699 N.E.2d 678, 682 (Ind. Ct. App. 1998) (an objection to allegedly improper remark in opening statement is necessary to preserve the issue on appeal), *trans. denied*.

Next, Piatek directs us to another statement during Beale's opening argument. He characterizes the statement as "clearly inappropriate," (Appellants Roger Jay Piatek, M.D., and The Piatek Institute's Brief (hereinafter "Piatek Br.") at 8), but offers no explanation or legal authority to indicate why the statement was reversible error. We therefore decline to address it. *See, e.g., Haynes v. Haynes*, 167 Ind. App. 55, 56, 337 N.E.2d 580, 581 (1975) (allegation of error waived when there "is no specific, cogent argument with citations of authority together with a showing of how the arguments and authorities are applicable to the facts of this case)."

Piatek then asserts the trial court "agreed that Beale [by her statements in opening argument] had violated the order *in limine*, but refused to grant a mistrial." (Piatek Br. at 8.) As Piatek offers no argument why the denial of that motion for mistrial on that basis was error, we may not address that allegation. *See Young v. Butts*, 685 N.E.2d 147, 151 (Ind. Ct. App. 1997) (a court that must search the record and make up its own arguments because a party has not adequately presented them runs the risk of becoming an advocate rather than an adjudicator).

Finally, Piatek asserts Beale's counsel made certain inappropriate statements in closing argument. The transcript reflects Piatek objected to the statements and the objections were sustained. It therefore is not apparent what allegations of error are before us with regard to those statements.

Piatek explained that sometimes diet and exercise are not sufficient to induce weight loss, and he therefore incorporates medication into the weight loss treatment he provides to clients. Beale wanted to lose ten pounds, so she went to Dr. Piatek's office the following week. Dr. Piatek prescribed Adipex.[2]

Beale returned to Dr. Piatek two weeks later and had lost 3.5 pounds. At that visit, Dr. Piatek prescribed Armour Thyroid, to be taken in conjunction with the Adipex. He told Beale the Armour Thyroid would burn an additional 100 calories a day.

She again saw Dr. Piatek two weeks later and had lost an additional 3.5 pounds. He instructed her to continue taking both medications. Five days later Beale broke out in a rash on her arm and chest. She went to an emergency room that day, and called Dr. Piatek's office the next day. She was told to come see Dr. Piatek, but Beale instead went to her family doctor. She returned to the emergency room the next day and was referred to Dr. Mary Greist, a dermatologist. When she saw Dr. Greist her skin eruption covered approximately seventy to ninety percent of her body. Dr. Greist's diagnosis was toxic epidermal necrolysis ("T.E.N."), a severe allergic reaction manifested in the skin and the mucosal surfaces and usually caused by a drug. Dr. Greist prescribed medication to Beale, who treated her condition at home. Dr. Greist continued to treat Beale for about a month.

Beale filed a medical malpractice complaint against Piatek before the Indiana

---

[2] Adipex is also known as Phentermine Hydrochloride, a sympathomimetic amine with pharmacologic activity similar to amphetamines. (Ex. 13.) Phentermine is a Schedule IV controlled substance. Ind. Code § 35-48-2-10(e).

Department of Insurance.  On October 15, 2007, the medical review panel issued a unanimous opinion that "the evidence supports the conclusion [Piatek] failed to comply with the appropriate standard of care."  (Trial Ex. 1.)  A majority of the panel believed Piatek's conduct "was a factor of [sic] the resultant damages," *id*., but one member felt "it cannot be determined whether the defendants['] conduct was a factor of [sic] the resultant damages." *Id*.

On November 30, 2007, Beale filed her Complaint against Piatek in the Marion Superior Court.  A jury returned a verdict for Beale.  Piatek filed a Motion to Correct Error, which was denied, and this appeal ensued.  Additional facts and procedural history will be discussed as they become relevant.

## DISCUSSION AND DECISION

1.      Piatek's Motion for Mistrial

In a pre-trial Request for Admission, Beale asked Dr. Piatek:

Please admit that Dr. Piatek violated IC 35-48-3-11 when he prescribed Phentermine to Shairon Beale for weight reduction on 4/16/03.
ANSWER: Defendants object to this Request on 5th Amendment[3] grounds. Without waiving the objection, Defendants maintain that Dr. Piatek did not violate IC 35-48-3-11 and denies this Request.

(App. at 193 (footnote added).)[4]

---

[3]  In this exchange counsel were referring to the Fifth Amendment to the United States Constitution. The Fifth Amendment provides that no person shall be compelled to be a witness against himself. *Clifft v. Indiana Dept. of State Revenue*, 660 N.E.2d 310, 313-14 (Ind. 1995).  This privilege is afforded in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory.  *Id*.

[4] The document in the Appendix is titled "**ROGER PIATEK, M.D.'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS AND INTERROGATORIES.**"  (App. at 191.)  The record does not include the original Response to the Requests for Admissions.

4

At trial, Beale's counsel asked Dr. Piatek a series of questions concerning Ind. Code Sec. 35-48-3-11.[5]  Piatek's counsel objected to that line of questioning:

Your Honor he is not an attorney, she shouldn't be asking him questions of law as to what the statute requires that would be totally improper.  What she can ask him is how he interpreted the application of the statute to him, when he gives her that answer that's the end of the inquiry otherwise she's asking him to practice law and that's not permissible.

---

[5] That statute provides:

(a) Only a physician licensed under IC 25-22.5 may treat a patient with a Schedule III or Schedule IV controlled substance for the purpose of weight reduction or to control obesity.
(b) A physician licensed under IC 25-22.5 may not prescribe, dispense, administer, supply, sell, or give any amphetamine, sympathomimetic amine drug, or compound designated as a Schedule III or Schedule IV controlled substance under IC 35-48-2-8 and IC 35-48-2-10 for a patient for purposes of weight reduction or to control obesity, unless the physician does the following:
    (1) Determines:
        (A) through review of:
            (i) the physician's records of prior treatment of the patient; or
            (ii) the records of prior treatment of the patient provided by a previous treating physician or weight loss program;
        that the physician's patient has made a reasonable effort to lose weight in a treatment program using a regimen of weight reduction based on caloric restriction, nutritional counseling, behavior modification, and exercise without using controlled substances; and
        (B) that the treatment described in clause (A) has been ineffective for the physician's patient.
    (2) Obtains a thorough history and performs a thorough physical examination of the physician's patient before initiating a treatment plan using a Schedule III or Schedule IV controlled substance for purposes of weight reduction or to control obesity.
(c) A physician licensed under IC 25-22.5 may not begin and shall discontinue using a Schedule III or Schedule IV controlled substance for purposes of weight reduction or to control obesity after the physician determines in the physician's professional judgment that:
    (1) the physician's patient has failed to lose weight using a treatment plan involving the controlled substance;
    (2) the controlled substance has provided a decreasing contribution toward further weight loss for the patient unless continuing to take the controlled substance is medically necessary or appropriate for maintenance therapy;
    (3) the physician's patient:
        (A) has a history of; or
        (B) shows a propensity for;
        alcohol or drug abuse; or
    (4) the physician's patient has consumed or disposed of a controlled substance in a manner that does not strictly comply with a treating physician's direction.
Ind. Code § 35-48-3-11.

5

(Tr. at 624.)

      This exchange followed:

> [Beale's counsel]:    Your Honor I'm not asking Doctor Piatek to practice law, he answered request for admissions and maybe we should do that, because remember when you plead [sic] the 5th and said you don't remember pleading the 5th, and said you don't remember pleading the 5th?
> [Piatek's counsel]:   Objection permission to approach?
> The Court:    All right.
> Beale's counsel:    In his request for admissions.
> COUNSELS APPROACH THE BENCH
> [Piatek's counsel]:   I want a mistrial; she's not allowed to do that in a civil case bringing up that someone claimed [. . . ]
> The Court:    Ladies and gentlemen I think we're going to conclude for today.

(*Id*. at 625) (footnote added). At that point, the trial court dismissed the jury and heard further argument on Piatek's Motion for Mistrial.

      After hearing arguments of counsel, the trial court admonished the jury, over the objection of Piatek's counsel,[6] as follows, "I want to admonish at this time that Dr. Piatek has never pleaded the Fifth in this case, and is not pleading the Fifth in this case. So disregard the question and the inference that could be made from that question." (*Id.* at 653.)

      A mistrial is an "extreme remedy that is warranted only when less severe remedies will not satisfactorily correct the error." *Suding v. State*, 945 N.E.2d 731, 737 (Ind. Ct. App. 2011), *trans. denied*. We give great deference to a trial judge's discretion in determining whether to grant a mistrial because the judge is in the best position to gauge the surrounding circumstances of an event and its impact on the jury. *Id*. When determining whether a

---

[6] Counsel argued the admonition the trial court planned to give was not factually correct because it suggested Piatek had entered a plea of guilty. The court told counsel the admonition would not mention a guilty plea, and it did not.

mistrial is warranted, we consider whether the defendant was placed in a position of grave peril to which he should not have been subjected. *Id.* The gravity of the peril is determined by the probable persuasive effect on the jury's decision. *Id.* A timely and accurate admonition is presumed to cure any error in the admission of evidence, *id.*, so reversible error will seldom be found if the trial court has admonished the jury to disregard a statement made during the proceedings. *Id.*

Piatek acknowledges the "only disputed issue is whether the Trial Court's admonishment [sic] cured the prejudice." (Piatek Br. at 10.) As Piatek has not demonstrated that presumption is overcome, we cannot hold denial of a mistrial was error.

In *Suding*, Suding sought a mistrial based on his wife's testimony in violation of a motion *in limine*. Suding was charged with conspiracy to commit murder. The State asked his wife whether she could think of anything during the relevant time period "that scared you or bothered you enough to be here," 945 N.E.2d at 738, and she said Suding became "more controlling and um, knocked me out one evening, out cold." *Id.* Suding objected and the jury was dismissed. When it returned the court instructed it to disregard the statement. It reminded the jury Suding had not been charged with domestic violence, and no such incident was at issue in the trial. In light of that admonition and that the witness's statement was brief, and relatively generic, as the witness did not go into detail regarding her accusations of domestic violence, we determined the trial court did not abuse its discretion in denying a mistrial. *Id.* The admonition "sufficiently cured the taint of the improper testimony." *Id.*

In *Owens v. State*, 937 N.E.2d 880, 895 (Ind. Ct. App. 2010), *trans. denied*, a child

7

molestation victim was asked why she did not immediately report the molestation. She responded she was afraid to report because Owens "abused us." *Id.* The trial court denied Owens's motion for mistrial and instead admonished the jury: "I'm going to admonish you at this point in time not to consider in any way the last statement from the witness. You shall disregard her last statement in regards to the reason why she did not tell anyone immediately after the incident." *Id.* at 894-95.

In the case before us, we decline to hold a generic reference to "pleading the 5th," (Tr. at 625), subjected Piatek to greater prejudice than did the references to domestic abuse in *Suding* or child abuse in *Owens.* The reference to "the 5th" was brief, and was "generic" as it does not appear the jury was told what "the 5th" referred to or what its specific implications might be to the case before it. Nor can we say the trial court's admonition was inadequate to cure "the taint of the improper testimony." *Suding*, 945 N.E.2d 738.

We find little Indiana authority addressing in depth when that presumption is overcome, and Piatek directs us to none. But we do find guidance in decisions from other states. In *Jones v. State*, 100 S.W.3d 1, 4-5 (Tex. App. 2002)*, pet. for discretionary review denied*, the court held an instruction to disregard is presumed to cure error except in extreme circumstances where the evidence is "clearly calculated to inflame the minds of the jury and is of such a character as to suggest the impossibility of withdrawing the impression produced on their minds." *Id.* Jones did not overcome the presumption because he presented no cogent argument demonstrating evidence the State elicited regarding a defense witness's prior criminal record "was of such a character that it was impossible for jurors to withdraw

8

the impression created by the evidence from their minds." *Id*. at 5.  Nor has Piatek.  *And see Kinney v. Butcher*, 131 S.W.3d 357, 360 (Ky. Ct. App. 2004) (absent evidence to the contrary, we must assume the admonition achieved the desired effect).

The Wisconsin Supreme Court applied similar reasoning in *Roehl v. State*, 253 N.W.2d 210, 217 (Wis. 1977):  "We have frequently said that possible prejudice to a defendant is presumptively erased from the jury's collective mind when admonitory instructions have been properly given by the court."  Piatek has not overcome this presumption as he has not demonstrated the jury would be unable to put the reference to "the 5th" out of its "collective mind."  The trial court did not abuse its discretion by denying Piatek's motion for a mistrial.

Piatek directs us to *Border Brook Terrace Condo. Ass'n v. Gladstone*, 622 A.2d 1248, 1253 (N.H. 1993), where the Court determined in an "extraordinary case" that an admonition did not cure prejudice from counsel's numerous improper statements.  The *Border Brook* Court noted decisions that upheld a trial judge's choice of curative instructions over a declaration of mistrial where the offending remarks were ambiguous, where the complaining party appeared to have brought the problem on himself, and where the incremental prejudicial effect of the remarks seemed minimal.  *Id.* at 1252.  On the other hand, it noted decisions reversing the denial of a motion for mistrial where counsel offered his or her personal opinion on a material issue and where a witness alluded to criminal conduct of the defendant similar to the conduct charged.  *Id.*

*Border Brook* is distinguishable.  There, a closing statement "combine[d] most of the

elements found so abhorrent" in the decisions that found an admonition inadequate to cure prejudice. *Id.* Counsel asserted facts not in evidence by insinuating that Gladstone's conduct was criminal and that profits were being "skimmed" from a different condominium project. Counsel offered his opinion on a material issue by stating, "I believe there was probably another association down in Florida that is having the profits from their project skimmed off." *Id.* As the allegation of similar behavior at the Border Brook condominium project was one of the main components of the plaintiffs' attempt to hold Gladstone personally liable, the assertion went directly to a material issue. *Id.* Finally, the remarks of plaintiffs' counsel were likely interpreted by the jury as assertions of criminal conduct similar to the conduct alleged as grounds for piercing the corporate veil: "The phrase 'having the profits from their project skimmed off' has a decidedly criminal ring to it; combined with the attorney's earlier allegation that 'some of the evidence may suggest to you that his conduct was less than law abiding,' the unfairly prejudicial effect is obvious." *Id.* The Court stated it did not "mean to imply that the bell may never be 'unrung.' Instead, we merely hold that in the extraordinary case, such as this one, the bell is simply too loud to be successfully dampened." *Id.* (citation omitted).

The statements in the case before us, unlike those in *Border Brook*, were not so egregious they could not be cured by the trial court's admonition to disregard them. Unlike the remarks in *Border Brook*, Beale's counsel's question whether Dr. Piatek "remember[ed] pleading the 5th" did not assert facts not in evidence. In a pre-trial Request for Admission, Beale asked Dr. Piatek to admit he violated Ind. Code § 35-48-3-11 when he prescribed

10

Phentermine to Beale. The Doctor responded "Defendants object to this Request on 5th Amendment grounds." (App. at 193.) Nor did Beale's counsel's statement indicate the Doctor had engaged in criminal activity. We acknowledge a reference to "pleading the Fifth" suggests some underlying criminal activity and may be prejudicial. But "pleading the Fifth" is not itself a criminal act; it is an assertion of a constitutional protection. Nor did counsel offer her personal opinion on a material issue as did the counsel in *Border Brook*. The trial court's admonition to Beale's jury was adequate.

2.      Contributory Negligence and Incurred Risk Instructions

In reviewing a decision to give or to refuse tendered instructions, we consider: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the instruction; and (3) whether the substance of the instruction is covered by other instructions. *Androusky v. Walter*, 970 N.E.2d 687, 691 (Ind. Ct. App. 2012). The trial court has discretion in instructing the jury and will be reversed on the last two above only when the instruction amounts to an abuse of discretion. *Id.* A party seeking a new trial on the basis of instructional error must show a reasonable probability his substantial rights have been adversely affected. *Id.*

a.      Contributory Negligence

The trial court denied Piatek's tendered instruction on Beale's contributory negligence. The general rule on the issue of the plaintiff's contributory negligence is that the plaintiff must exercise that degree of care that an ordinary reasonable person would exercise in like or similar circumstances. *Sawlani v. Mills*, 830 N.E.2d 932, 941 (Ind. Ct. App. 2005),

11

*trans. denied.* Contributory negligence is conduct on the part of the plaintiff that contributes as a legal cause to the harm he has suffered and falls below the standard to which he is required to conform for his own protection. *Id.* A patient may be contributorily negligent by failing to follow a physician's instructions. *Id.* at 941-42. But to be a bar to recovery, contributory negligence must be a proximate cause of the injury. *Id.* at 942. As there was no evidence of "conduct on the part of [Beale] that contributes as a legal cause to the harm [she] suffered," *id.* at 941, the trial court was not obliged to instruct the jury on contributory negligence.

Piatek argued a contributory negligence instruction should be given because Beale did not return to his office for treatment after developing the skin eruption, and:

> We know [Beale] had taken four times the medication she was suppose [sic] to at least one point prior. We know from the same medical record that she had unilaterally changed her own dosage on Armour Thyroid in 1995. Given that the testimony in this case, it that it would have to be a large --- larger dose of these medications to cause T.E.N. There is enough evidence at least to get pass [sic] a motion for judgment on the evidence on the issue of "contributory negligence."

(Tr. at 943-44.)

Dr. Piatek cites *King v. Clark,* 709 N.E.2d 1043, 1047-48 (Ind. Ct. App. 1991), *trans. denied*, where King delayed obtaining diagnostic tests and immediately beginning chemotherapy so she could first consult with other physicians. That was sufficient evidence to support an instruction on contributory negligence based on King's failure to follow instructions. *Id.* at 1048.

Beale did not return to Dr. Piatek's office, but unlike King, she did not delay

treatment; instead, she sought treatment from other physicians. There was no evidence the treatment she received from the other physicians was improper or inadequate,[7] or that Dr. Piatek's treatment would have been different. We decline to find evidence to require a contributory negligence instruction on that basis.

Dr. Piatek also argues the jury could have found Beale failed to follow Dr. Piatek's instructions concerning the dosage of the prescription medications. There was evidence of one instance years earlier when Beale took a larger than prescribed dosage of a thyroid medication, and there was expert testimony that the two medications Dr. Piatek prescribed could have caused a toxic reaction if the prescribed amount was outside the normal thyroid range. The trial court did not abuse its discretion on refusing a contributory negligence instruction on this testimony.

### b. Incurred Risk

Dr. Piatek also submitted an instruction on incurred risk. In *Spar v. Cha*, 907 N.E.2d 974, 981 (Ind. 2009), our Indiana Supreme Court stated that:

> [A]ssumption of the risk – whether in the express primary, or secondary sense

---

[7] Piatek asserts "[e]vidence also showed that Dr. Greist, from whom Beale ultimately sought treatment, provided inappropriate care for T.E.N." (Piatek Br. at 26.) That is a mischaracterization of the testimony to which Piatek directs us. Piatek cites testimony spanning four pages of the record, almost all of which addressed whether a "normal" T.E.N. patient should be hospitalized and placed in a burn unit, and whether an ophthalmologist should be involved in treatment. (*See* Tr. at 526-28.) The witness noted Beale had not been hospitalized or treated by an ophthalmologist, but he did not testify Beale's condition required hospitalization or ophthalmologic treatment. He further noted that in a certain category of case, treatment by an ophthalmologist is "not essential because the eye is not complicated [sic] in that setting." (Tr. at 528.) He did not testify whether Beale was in that category.

Dr. Greist did not hospitalize Beale for T.E.N. She testified she normally ordered patients with this condition to be hospitalized, but she allowed Beale to treat herself at home because she was bright, compliant, had someone to care for her, and the risk for infection would have been less at home than in a hospital. (*Id.* at 307-09.)

13

– has little legitimate application in the medical malpractice context. As the District of Columbia Court of Appeals has explained, "the disparity in knowledge between professionals and their clientele generally precludes recipients of professional services from knowing whether a professional's conduct is in fact negligent." *Morrison v. MacNamara,* 407 A.2d 555, 567 (D.C. 1979) (citations omitted), accord *Smith v. Hull,* 659 N.E.2d 185, 194 n. 6 (Ind. Ct. App. 1995) (Sullivan, J. concurring). As a result, "there is virtually no scenario in which a patient can consent to allow a healthcare provider to exercise less than 'ordinary care . . . .'" *Storm v. NSL Rockland Place, LLC,* 898 A.2d 874, 884 (Del. Super. Ct. 2005).

No such scenario is presented here. For incurred risk to be an issue there must be conscious, deliberate, and intentional action with knowledge of the circumstances. *Power v. Brodie,* 460 N.E.2d 1241, 1243 (Ind. Ct. App. 1984). More than the general awareness of a potential for mishap is required;[8] it contemplates acceptance of a specific risk about which plaintiff actually knows. *Id.* We have held in the medical malpractice context: "In determining whether a plaintiff incurred the risk of his or her injuries, a subjective analysis is required focusing on the plaintiff's *actual knowledge and appreciation of the specific risk*[9] involved and the plaintiff's voluntary acceptance of that risk." *Faulk v. Nw. Radiologists,*

---

[8] Piatek asserts there was evidence Beale voluntarily incurred the risk because she testified she knew "[a]ny medicine could have a side effect." (Piatek Br. at 35.) We decline Piatek's invitation to hold such knowledge is evidence of incurred risk, as such a holding could preclude almost every medical malpractice action premised on any side effect of any medication used for treatment.

[9] Piatek argues the doctrine of incurred risk does not require "Beale had precise knowledge of the specific side effect she would suffer," *i.e.,* T.E.N. (Piatek Br. at 37.) Piatek relies on decisions involving golfers struck by golf clubs and riders who fell off horses. In those cases, we held a plaintiff could incur risk without a showing that plaintiff "had prescience that the particular accident and injury which [sic] in fact occurred was going to occur." *Forrest v. Gilley,* 570 N.E.2d 934, 936 (Ind. Ct. App. 1991), *trans. denied. Forrest* and similar decisions do not require an incurred risk instruction in the case before us. The *Forrest* court explicitly noted the requirement of "actual knowledge of the specific risk," *id.*, and "the specific risk was that Gilley would fall off the horse and be injured." *Id.* To hold in the case before us that Beale incurred risk, as Piatek argues, solely by taking medicine that might have any type of side effect, would be inconsistent with our language in *Faulk* and with the reasoning in *Spar.*

14

*P.C.*, 751 N.E.2d 233, 243 (Ind. Ct. App. 2001) (emphasis added), *trans. denied*.

Dr. Piatek argued there was evidence to support such an instruction because:

We know [Beale] had been on thyroid medication before, so she had had warnings about the risks of these medications. We know that she signed an incurred risk form that the Jury has seen, in which she's specifically signed, that the risk of the medication has been explain [sic] to her, that Dr. Piatek has answered all of her questions to her understanding, and satisfaction. We also know that she went through an orientation process. We know that she has described Dr. Piatek as being very knowledgeable, and Dr. Piatek has testified that he has -- warned her of the known risk of the medication. If the Plaintiffs are willing to argue only deviations that actually could have led to T.E.N., then I think there's probably no need for an incurred risk instruction. But to the extent they have deviations that could not have caused T.E.N. -- For example the statute, whether or not that statute was complied with, has absolutely nothing to do with whether or not the medications caused T.E.N. The statute is only about the process of prescribing medications. And so by painting such a broad scope of alleged deviations, we are entitle [sic] to have an incurred risk instruction, to the extent the jury starts wondering about other potential harms that may have occurred . . . at least to certain potential damages claimed.

(Tr. at 940-42.)

When Beale first visited Dr. Piatek, she signed a form that stated:

DR. PIATEK EXPLAINED TO ME THE RISKS OF TAKING MEDICATION. HE HAS ANSWERED ALL MY QUESTIONS TO MY UNDERSTANDING AND SATISFACTION. I UNDERSTAND I CAN ASK QUESTIONS THROUGHOUT MY ENTIRE TREATMENT. I ACCEPT THE RESPONSIBILITY AND RISK OF TAKING THE MEDICATION PRESCRIBED TO ME; THEREFORE ANY SIDE-EFFECTS OR OUTCOME THAT MAY BE PRODUCED I WILL NOT HOLD DR. PIATEK/PIATEK INSTITUTE LIABLE. I ALSO AGREE TO ONLY TAKE THE MEDICATIONS AS PRESCRIBED.

(Trial Ex. H).

The following exchange took place at trial:

[Beale's counsel]: So what were the --- What did you tend [sic] by the words, "any side effects or outcome'" what side effects were you talking

about?

Dr. Piatek:    I didn't draft it.

* * * * *

[Beale's counsel]:    But what did you want your patients to understand by signing that?

Dr. Piatek:    I'm not an attorney.  I didn't know.  My attorney drafted it.

[Beale's counsel]:    I understand you're saying an attorney drafted this sir. But you're having your patients sign a document that they're giving up their liability to sue you for any side effects or outcome, so what did you intend for them to understand by any side effects or outcome.

Dr. Piatek:    I don't know Mary.

[Beale's counsel]:    So if you don't know, then your patients couldn't know either, would you agree with that?

Dr. Piatek:    No I don't.

[Beale's counsel]:    What outcomes were you talking about Sir?

Dr. Piatek:    The side effects of the medications.

[Beale's counsel]:    And what were those?

Dr. Piatek:    Well certainly, T.E.N. wasn't one of them.

(Tr. at 662-63.)

We decline to attribute to Beale a better understanding of that document than Dr. Piatek had, and in light of Dr. Piatek's testimony that T.E.N. was not a side effect he anticipated, we decline to find the document informed Beal of the specific risk Piatek alleges she incurred.  There was evidence Dr. Piatek told his patients Adipex and Armour Thyroid had side effects, but there was no evidence Dr. Piatek warned Beale that these medications, taken together, presented a risk of T.E.N.  Nor was there evidence Dr. Piatek warned Beale of the risks of taking Armour Thyroid and Adipex together.  As she was not warned, she could not have known, appreciated, or voluntarily accepted those specific risks.

Dr. Piatek also argues that Beale incurred the risk because she elected to avoid conventional treatment and instead requested Dr. Piatek's "pioneer" treatment. (Piatek Br. at

16

40.) This argument was not made before the trial court, and cannot be brought up on appeal for the first time. *See Aocker v. Buell*, 147 Ind. App. 422, 428, 261 N.E.2d 894, 898 (1970) (we are a reviewing court and do not have jurisdiction to pass on a question raised for the first time in this court). The trial court was not obliged to instruct the jury on incurred risk.

## CONCLUSION

The trial court's admonition was sufficient to cure any prejudice from Beale's reference to Dr. Piatek pleading the Fifth Amendment, and the trial court did not err in denying his Motion for Mistrial. The evidence presented at trial did not support instructions on Beale's contributory negligence or incurred risk. We accordingly affirm.

Affirmed.

BAKER, J., and MATHIAS, J., concur.